Argued May 12, reversed July 13, petition for rehearing denied
September 15, 1954

# BERRY TRANSPORT, INC. *v.* HELTZEL
272 P. 2d 965

*William B. Adams,* of Portland, argued the cause and filed a brief for appellant.

*Robert R. Hollis,* Assistant Attorney General, of Salem, argued the cause for respondent. With him on the brief were Robert Y. Thornton, Attorney General, and John R. McCullough, Assistant Attorney General, both of Salem.

*Earle V. White, Jr.,* of Portland, filed a brief as amicus curiae.

TOOZE, J.

This is an appeal by the plaintiff, Berry Transport, Inc., a corporation, from a decree affirming an order of the Public Utilities Commissioner of the state of Oregon, denying the application of plaintiff for a permit to conduct local cartage services in the city of Portland, as a common carrier.

Plaintiff is the holder of Oregon Public Utilities

Commission permit number AF 37346-1, which authorizes the transportation of general commodities as a common carrier between points "within 50 road miles of Portland, Oregon, and from Portland or any point within 50 road miles thereof to any point in Oregon, and from any point in Oregon to Portland or any point within 50 road miles thereof." Plaintiff and its predecessor have held such authority for approximately 20 years. Under such authority, since originally issued, plaintiff and its predecessor have engaged continuously in both intercity operations and local cartage operations in the city of Portland. The operations within the city of Portland have constituted about 50 per cent of the loads carried by the plaintiff and 30 per cent of the income from its total business within the state. The financial success of plaintiff's business as a whole depends upon a continuation of its local cartage operations within the city of Portland. The motor vehicles of plaintiff have been continuously used interchangeably in the local cartage and intercity operations.

Three assignments of error are presented by plaintiff:

"No. 1. The trial court erred in concluding in effect that the plaintiff did not have authority to conduct local cartage operations in Portland and therefore was not required to file for a permit under Section 11, sub-section 1, Chapter 467, Laws of 1947; and

"No. 2. The trial court erred in sustaining the finding of the Commissioner that the application of plaintiff was not in the public interest; and

"No. 3. The trial court erred in sustaining the finding of the Commissioner that plaintiff was a habitual violator of the Motor Transportation Act, and hence, not a proper person to whom a permit could be issued."

The view we take of this case renders unnecessary a discussion of assignments of error numbered 2 and 3. It is only with assignment of error numbered 1 that we are concerned.

To decide the issue presented by the first assignment of error requires the interpretation of subsection 1 of § 11, ch. 467, Oregon Laws 1947. That section provides:

> "Section 11. 1. There *shall be issued* by the commissioner *to persons* not expressly excluded from the terms of this act and *now owning and operating motor vehicles* or trailers in for hire service *exclusively* within the incorporated limits of cities and towns in Oregon *permits to operate* as common or contract carriers within the incorporated limits of cities and towns in Oregon, conditioned that said carriers comply with this act and the laws of this state, *and further conditioned that they make application* for said permit within 90 days after the effective date of this act. *The issuance of permits to common carriers who do not hold permits as motor carriers under existing laws shall,* except as hereinabove provided and as hereinafter provided in subdivision 4 of this section, *be made only after hearing had and showing made* as required by the following subdivision 2 of this section 11." (Italics ours.)

Prior to and at the time of the enactment of ch 467, Oregon Laws 1947, persons operating motor vehicles as carriers for hire wholly within the incorporated limits of a city or town were exempt from the provisions of the Motor Transportation Act. No permit for the conduct of such local cartage operations was required to be issued by the Public Utilities Commissioner of the state of Oregon. Section 1, ch 197, Oregon Laws 1945 (amending § 115-503, OCLA, as

amended by ch 435, Oregon Laws 1941), provided in part as follows:

> "No portion of this act, except this section * * *, shall apply to persons operating motor vehicles (a) when operated *wholly* within the limits of an incorporated city or town in which the original starting point of such vehicle is located and which operation either alone or in conjunction with another vehicle or vehicles is not a part of any journey beyond said limits; * * *." (Italics ours.)

The word "wholly" as used above is synonymous with the word "exclusively" as employed in § 11 of the Act of 1947, supra.

At the time the Act of 1947 became effective, plaintiff's permit embraced operations within the city of Portland, as well as operations between that city and other parts of the state. Of course, plaintiff's permit was not specifically directed to local cartage operations, because no such permit was required, but it did include such transportation. The sole question for determination here is whether, under the terms of § 11 of the Act of 1947, plaintiff was a person "now owning and operating motor vehicles or trailers in hire service *exclusively* within the incorporated limits" of the city of Portland, and was, therefore, required to apply for a permit for the conduct of such local cartage operations.

■ In the construction of statutes, when construction is necessary or proper, the primary and governing rule to be followed and the one that is law and binding upon the court is to ascertain and declare the legislative intent. All other rules of statutory construction are secondary in importance and are simply guides to aid in the application of the primary rule. Rules for the construction of statutes are provided by law in this state.

Section 2-216, OCLA (ORS 174.010), provides:

"In the construction of a statute * * *, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all."

Section 2-217, OCLA (ORS 174.020), provides:

"In the construction of a statute the intention of the legislature * * * is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

In *Swift & Co.* and *Armour & Co. v. Peterson,* 192 Or 97, 108, 233 P2d 216, Mr. Justice WARNER, speaking for the court, said:

"The cardinal rule for the construction of a statute is to ascertain from the language thereof the intent of the lawmakers as to what purpose was to be served, or what object was designed to be attained. Leonard v. Ekwall, 124 Or. 351, 359, 264 P. 463; Fox v. Galloway, 174 Or. 339, 346, 148 P. (2d) 922."

■ However, it is only in cases where the language used in a statute is ambiguous and uncertain that resort may be had to rules of statutory construction in ascertaining and declaring the legislative intent. It is elementary that when the legislature, in enacting a law, makes use of plain, unambiguous, and understandable language, it is presumed to have intended precisely what its words imply. There is no occasion to go beyond those words and their plain meaning to ascertain by application of rules of statutory con-

struction the legislative purpose. The words used speak for themselves.

In 82 CJS 571, Statutes, § 322(1), it is stated:

"The intention of the legislature is to be ascertained primarily from the language used in the statute, irrespective of the fact that the phraseology of the statute may be awkward, slovenly, or inartificial. Accordingly, the meaning of statutes is to be sought and ascertained from their language."

And in 82 CJS 577, Statutes, § 322(2), it is further stated:

"Where the language of statute is plain and unambiguous, there is no occasion for construction, and this is true even though other meanings of the language employed could be found. The court cannot indulge in speculation as to the probable and possible qualifications which might have been in the mind of the legislature, or assume a legislative intent in plain contradiction to words used by the legislature, and need not search for the reasons which prompted the legislature to enact the statute.

"*An unambiguous statute must be given effect according to its plain and obvious meaning,* and such unambiguous statute cannot be extended beyond its plain and obvious meaning, or restricted to, or confined in operations within, narrower limits or bounds than manifestly intended by the legislature, because of some supposed policy of the law, or because the legislature did not use proper words to express its meaning, otherwise the court would be assuming legislative authority. *In construing a statute expressed in reasonably clear language, the court should neither read in nor read out; * * *.*" (Italics ours.)

In *Fox v. Galloway,* 174 Or 339, 347, 148 P2d 922, Mr. Justice BAILEY, speaking for the court, stated the

following rule as applied to statutes containing plain and unambiguous language:

"If the language used is plain and unambiguous, if it can be given but one meaning, and that meaning does not lead to an impossibility or an absurdity such as the legislature could not be supposed to have intended, the court must give effect to that meaning if constitutional, even though the result may be, in the court's opinion, harsh, unjust or mistaken in policy * * *."

It is our opinion that subdivision 1 of § 11, ch 467, Oregon Laws 1947, supra, is couched in language that is plain, unambiguous, and understandable, and which clearly discloses the legislative intent.

■ The primary purpose of the Act is quite evident. The legislature simply intended to place under the jurisdiction of the Public Utilities Commissioner intra-city operations which had theretofore been exempt from the provisions of the Motor Transportation Act, persons engaged as carriers for hire who operated exclusively within a city and who had not theretofore been required to secure permits under the law.

The section of the law being considered concerns itself only with permits. It has nothing to do with license fees, tax rates, and other regulations and requirements of the Motor Transportation Act. It is clear that a person securing or holding a permit authorizing local cartage operations would be subject to the tax rates and other regulations provided under the law for such local operations, no matter when the permit was issued. The only question with which we are concerned is plaintiff's right under its permit to operate in intracity transportation, not with the regulations and conditions governing such operations.

Until the enactment of 1947, persons operating

motor vehicles for hire *"wholly"* within the limits of an incorporated city or town were not required to obtain a permit from the Public Utilities Commissioner. Upon the effective date of the 1947 Act, those persons who were then owning and operating motor vehicles for hire *exclusively* (wholly) within the limits of an incorporated city or town were required to secure a permit, the same as plaintiff and other common carriers for hire had theretofore been required to do, in carrying on their state-wide transportation activities, including their local cartage operations.

Under the provisions of the Act, those persons who had been operating *exclusively* within a city or town prior to the enactment and effective date of the law were entitled to be issued a permit as a matter of course, provided they applied therefor within the 90-day period. As to such persons, the issuance to them of permits was mandatory; the Public Utilities Commissioner had no discretion in the matter.

It is clear that plaintiff did not come within the class of persons described in the first sentence of the Act. It already held a permit, and its operations were not then, nor had they ever been, confined *exclusively* or *wholly* to local cartage operations within the limits of any incorporated city, although local cartage operations in the city of Portland had long been included in its state-wide business, and were fully authorized by its permit, and as to which local cartage operations (along with and as an integral part of its over-all operations as a common carrier), it was required to and did file rate, fare, and charge schedules (§ 115-506 (2), OCLA), make annual reports (§ 115-510, OCLA), and pay a tax of "one (1) mill per combined weight ton mile" (§ 115-517, OCLA).

The intention of the legislature is clearly demon-

strated when we consider the language it used in writing the second sentence appearing in subdivision 1 of § 11:

"*  *  * The issuance of permits *to common carriers who do not hold permits* as motor carriers *under existing law* shall, except as hereinabove provided *  *  *,  be made only after hearing had and showing made  *  *  *." (Italics ours.)

It is plain from the foregoing that only common carriers who did not hold permits under the law as it existed at the time ch 467, Oregon Laws 1947, was enacted were required to apply for permits and were subject to the restriction that no such permits would be issued except after a hearing. The permits referred to by the term "except as hereinabove provided" meant the permits that were to be issued as a matter of course to applicants therefor who at the time were engaged exclusively in intracity operations.

Therefore, under subdivision 1 of § 11, special provision is made for the issuance of permits to two classes of common carriers: (1) those who had been and were then engaged *exclusively* in local cartage operations; and (2) those who did not hold permits as motor carriers which had theretofore been issued to them under the terms of the Motor Transportation Act. The law specifically required that they obtain permits, the one as a matter of course, the other only after a hearing. The language used in subdivision 1 as last above quoted is a clear recognition of the existence of permits which had theretofore been issued to some common carriers. As to such carriers so holding permits, no provision whatever was made for the issuance to them of other or additional permits, with or without a hearing. Manifestly, in dealing with the subject of permits, if the legislature had intended that such a common

carrier should apply for a further permit to operate as a common carrier within a city, it would have so stated. For us to hold that plaintiff was required to apply for and secure a new permit under subdivision 1 of § 11 of the Act of 1947 would necessitate our rewriting the statute, and would compel us to completely ignore the very expressive word "exclusively" used therein, and this is true whether we treat the word "exclusively" as referring to a type of operation or merely as a part of the description of the persons to whom permits shall issue. We would be forced "to insert what has been omitted" and "to omit what has been inserted" in the statute, in direct violation of the prohibition contained in § 2-216, OCLA (ORS 174.010). We would have to consider the statute as reading thus: "There shall be issued to all persons now owning and operating motor vehicles in for hire service within the incorporated limits of cities and towns * * * permits to operate as common or contract carriers within the incorporated limits of cities and towns * * *." Of course, if the statute so read, its terms would be all-inclusive, and plaintiff, as well as all other common carriers similarly situated, would come within its terms; but the statute does not so read. It contains the word "exclusively", and to that word must be given meaning and effect. To do otherwise would amount to judicial legislation. We are not permitted to ignore the plain import of the language used in subdivision 1 of § 11.

◾ We hold that plaintiff was not required under the Act of 1947 to apply to defendant for an additional permit to continue its local cartage operations within the city of Portland. Such operations are fully authorized under the permit it held at the time the 1947 Act was adopted, and now holds; subject, however, to

all rules, regulations, fees, and taxes prescribed under the law for such intracity transportation for hire.

The decree is reversed.

LUSK, J.

I dissent.

The statute which we are called upon to construe is § 11.1 of the Motor Transportation Code, Oregon Laws 1947, ch 467, hereafter referred to as the 1947 Code. It reads:

"There shall be issued by the commissioner to persons not expressly excluded from the terms of this act and now owning and operating motor vehicles or trailers in for hire service exclusively within the incorporated limits of cities and towns in Oregon permits to operate as common or contract carriers within the incorporated limits of cities and towns in Oregon, conditioned that said carriers comply with this act and the laws of this state, and further conditioned that they make application for said permit within 90 days after the effective date of this act. The issuance of permits to common carriers who do not hold permits as motor carriers under existing law shall, except as hereinabove provided and as hereinafter provided in subdivision 4 of this section, be made only after hearing had and showing made as required by the following subdivision 2 of this section 11."

The question is whether the plaintiff, Berry Transport, Inc., hereafter called Berry, has the right to engage in what is termed local cartage operations as a common carrier transporting property within the city of Portland without a permit so to operate from the public utilities commissioner. A local cartage operation is one which is performed wholly within the limits of an incorporated city or town. Oregon Laws 1949, ch 488 § 3, p. 744. Berry had operated for several years under a permit from the commissioner which

authorized the transportation of general commodities between points "within 50 road miles of Portland, Oregon, and from Portland or any point within 50 road miles thereof to any point in Oregon, and from any point in Oregon to Portland or any point within 50 road miles thereof." It also conducted local cartage operations within Portland. This case is concerned solely with those operations.

It is conceded (as I thought by everyone concerned until I read the court's opinion) that up until the effective date of the 1947 Code, which was January 1, 1948, the commissioner had no jurisdiction over motor carriers engaged in local cartage service. Since the court holds that this is not true of carriers like Berry who were engaged in both local cartage and intercity operations, I shall first address myself to that question.

The law in effect at the time of the enactment of the 1947 Code was Oregon Laws 1945, ch 197 § 1, amending OCLA § 115-503, as amended by Oregon Laws 1941, ch 435, which provided in part:

"Sec. 115-503. No portion of this act, except this section and section 115-533, shall apply to persons operating motor vehicles (a) when operated wholly within the limits of an incorporated city or town in which the original starting point of such vehicle is located and which operation either alone or in conjunction with another vehicle or vehicles is not a part of any journey beyond said limits; * * *

"Persons operating vehicles under exempted class (a) shall be subject to regulations of the cities and towns in which they operate in so far as the operations are wholly within the corporate limits of such city or town. * * * *"

The exception of OCLA § 115-533 is not material to the present discussion.

These provisions were a part of the 1933 Motor Transportation Act (see Oregon Laws 1933, ch 429 § 3) and remained unchanged through subsequent amendments until their repeal by the 1947 Code, with the exception that the exemption extended originally to a three-mile zone beyond the corporate limits of a city or town.

It is my opinion that the language of exemption (a) describes a particular operation, that is, an operation "wholly within the limits of an incorporated city or town", and that the fact that a carrier engaged in such an operation was also conducting an intercity operation is irrelevant to the question of whether the intracity operation was exempt. If there could be any room for a reasonable difference of opinion about this—and I think there is none—it would be removed by the provision which delegates to cities and towns the regulation of those exempted under class (a). Those in class (a), the statute said, "shall be subject to regulations of the cities and towns in which they operate *in so far as the operations are wholly within the corporate limits of such city or town.*" From this language it is manifest that the legislature had in mind carriers like Berry who engaged both in local cartage and intercity operations. Their local cartage operations, being exempt, were subject to the jurisdiction of cities and towns, their intercity operations to that of the commissioner.

These things being true, the commissioner had no authority to issue permits for local cartage operations, under the former legislation, and such a permit, had it been issued, would have conferred no rights on anyone. It would have been a mere scrap of paper, for motor carriers had the right so to operate without it. They were under the jurisdiction of cities and towns

and subject to their regulation. The plaintiff's permit does not purport to extend to local cartage service, and any contention that it does not only involves rewriting the permit, but also an imputation that the commissioner who issued it had usurped an authority not delegated to him by the legislature.

The 1947 Code repealed all former legislation on the subject and removed the exemption of local cartage operations by omitting it. For the first time such operations came under the jurisdiction of the public utilities commissioner, and persons desiring to engage therein were required to obtain a permit from that official by the following provision of § 9.1:

> "Permit to operate. It shall be unlawful for any person to operate any motor vehicle on any highway in this state as a common carrier, either as a fixed termini or anywhere-for-hire carrier, a contract carrier or private carrier in the transportation of persons or property or both without first applying for and obtaining, in addition to the license required by law, a permit from the commissioner *covering the proposed operation.*" (Italics added.)

With the exception of a single provision affecting contract carriers § 11.1 relates to the issuance of permits to common carriers. Provisions for issuing permits to contract carriers are found in § 12. Section 11 tells us who may obtain permits without a hearing and who may obtain them only after a hearing. It has procedural provisions, among others that upon the filing of an application for a permit to operate as a common carrier "the commissioner shall investigate the application and if the proposed operation is competitive with existing carriers or there is protest against the granting of the permit, shall fix a time and place for a hearing thereon." It prescribes the facts which must be found by the commissioner before he is authorized to

issue a permit in cases where a hearing is required. Included among these is "that the operation proposed is in the public interest". The first sentence of § 11.1 confers what commonly referred to as "grandfather rights"—a provision granting preferential treatment to persons who have been operating in a field not theretofore covered by the law and wish to continue such operations after they become subject to the law. See, 37 Am Jur 530, Motor Transportation § 11; 67 ALR 965. The purpose of the first sentence of § 11.1 was to enable persons theretofore engaged in local cartage operations, whether as contract carriers or common carriers, to obtain permits to continue such operations without the necessity of a hearing, provided they made application within 90 days after the effective date of the Act, that is, by March 31, 1948. The second sentence of the section requires all common carriers who do not already hold permits under existing law, with the exception of those then engaged in local cartage service and another exception which will be noticed later, to submit to a hearing and make the showing detailed later in the section before permits can be issued to them.

Who were the persons who were entitled to preferential treatment under the first sentence of § 11.1? I would say that they are quite obviously the same persons whose operations in local cartage service had been up to 1947 exempt from regulation by the public utilities commissioner. Berry was one of those carriers "in so far as [its] operations are wholly within the corporate limits" of Portland. The legislature described the same class of operations in the exemption provision as in the provision conferring "grandfather rights", to the end that when the exemption was abolished those who had theretofore operated

under the exemption would be entitled to the preferential treatment. If this is not what was intended, then a class of carriers who were operating under the exemption, and of whom the plaintiff was one, were excluded from the benefits of the ''grandfather clause'', a result which, I suggest, makes no sense.

The court says in its opinion that the word ''wholly'', as used in the exemption provision of the former law and ''exclusively'' as used in § 11.1 of the 1947 Code are synonymous. With that I agree, and so does Funk & Wagnalls New Standard Dictionary. If, therefore, the word ''wholly'' in the exemption provision is used to aid in the description of a type or operation—and about this there should be no debate —then the word ''exclusively'' serves the same purpose in § 11.1.

That word appears frequently in the 1947 Code in connection with the description of various classes of operation. It is so used in § 3 where exempted operations are listed. It is used not only in Subdivision 1 of § 11 but again in Subdivision 4 of that section where are enumerated several classes of operations for which permits may be issued without a hearing. These are expressly excepted from the requirements of the second section of § 11.1. Among them are ''common carriers engaged exclusively in the transportation of logs  *  *  *  by motor vehicles over the public highways from the point of origin to mill, retail yard or shipping point.'' Applying the court's interpretation of the word *''exclusively''* to this provision, it would mean that a carrier engaged in such an operation, and also engaged as a common carrier in transporting gasoline between two cities, would not be entitled to the privilege of obtaining a permit without a hearing because it would not be engaged *exclusively*

in the transportation of logs, as described in Subdivision 4. I do not suppose that the majority would adopt any such interpretation. Yet, in the absence of anything in the statute clearly indicating a contrary intent, where the same word or phrase is used in different parts of a statute, it will be presumed to be used in the same sense throughout; and, where its meaning in one instance is clear, this meaning will be attached to it elsewhere. *Holman Transfer Co. v. Portland*, 196 Or 551, 563, 249 P2d 175, 250 P2d 929; *In re Norton's Estate*, 177 Or 342, 347, 162 P2d 379, 161 ALR 439.

I come now to a consideration of the second sentence of § 11.1 and will quote it again:

"The issuance of permits to common carriers who do not hold permits as motor carriers under existing law shall, except as hereinabove provided and as hereinafter provided in subdivision 4 of this section, be made only after hearing had and showing made as required by the following subdivision 2 of this section 11."

The foregoing, as I view it, is a requirement of a hearing before a permit may be issued to a common carrier who does not already hold a permit, with the exceptions stated. It applies to anyone in Berry's situation who neglected, as Berry did, to exercise its "grandfather rights". Berry never held a permit to engage in a local cartage operation in Portland, and it therefore was one of those included within the language "common carriers who do not hold permits as carriers under existing law". A provision substantially identical with this second sentence was in the 1933 Motor Transportation Act and remained until the repeal of that Act in 1947. Of course, the exceptions were different because in the former legislation the

beneficiaries of the "grandfather rights" were different. See Oregon Laws 1933, ch 429 § 11; Oregon Laws 1933, Second Special Session, ch 45 § 3; Oregon Laws 1935, ch 415 § 8. The obvious purpose running through all this legislation has been to make a hearing a prerequisite to the grant of a permit in all cases except those specifically excepted. But, if the majority of the court are right in their construction of this language, then ever since 1933 a common carrier who had a permit for one operation has been entitled to engage in any other distinct operation it may choose without a permit.

The court says respecting this provision:

"* * * Manifestly, in dealing with the subject of permits, if the legislature had intended that such a common carrier should apply for a further permit to operate as a common carrier within a city, it would have so stated."

The answer is that the legislature has so stated. It has made it unlawful for any person to operate as a common carrier on the highways of this state without a permit from the commissioner "covering the proposed operation." § 9.1. "Any person" includes Berry. It has provided in the same section that the commissioner shall prescribe forms of application for permits which shall state, among other things, "the district or territory in which the operation is to be conducted, and if upon fixed route the termini thereof." These provisions have been in the law since 1933. See Oregon Laws 1933, ch 429 § 9.1 and all subsequent amendments. The purpose of § 11 is not to require the obtaining of permits. That purpose had already been accomplished in § 9.1. Section 11 prescribes the *methods* and *procedure* for obtaining permits, but it does not relieve anyone from the necessity

of obtaining a permit for the particularly defined operation in which he proposes to engage.

The word "permits" in the second sentence of § 11.1 refers to the only kind of permit known to the law, that is to say, a permit for a "proposed operation". It is not permissible to read the word out of context as though the provision meant that a hearing is not required where a common carrier holds a permit under existing law, although it seeks a permit for a different operation than that which its permit authorizes. The commissioner has never had authority to issue permits to common carriers without defining the territory and the class of service, and the legislature certainly did not intend that anyone who held a permit for a particular operation was to be exempted from the requirement of obtaining a permit for another and distinct operation. Yet, that is the effect of the court's decision. The court says that because Berry held a permit, issued when local cartage service was exempt, to carry on an intercity operation, the legislature has dispensed it from the requirement of obtaining a permit to operate intracity. The court holds that Berry was not entitled to preferential treatment under the first sentence of § 11.1; that it cannot be required to submit to a hearing in order to obtain a permit under the second sentence; and in this process of construction of a statute—which the court says needs no construction, because its language is "plain, understandable and unambiguous"—Berry's permit to engage in one operation is transmuted by judicial alchemy, certainly not by the legislature, into a permit to engage in another and distinct operation. I think that these conclusions disclose a misinterpretation of the language of the statute and a total misapprehension of the legislative intent.

Although the court determines that the permit which the plaintiff now holds is all the authority it needs for the continuation of its local cartage operations in Portland, the opinion says "plaintiff's permit was not specifically directed to local cartage operations, because no such permit was required, but it did include such transportation." This is quite confusing. If, as the court elsewhere seems to say, plaintiff's local cartage operations were not exempt under the former legislation, since, to quote from the opinion, it was not operating " 'wholly' within the limits of an incorporated city or town"—because it had other operations—then it was required to obtain a permit for such operations, for, if they were not exempt, they were subject to the jurisdiction of the commissioner. And just what the court has in mind when it speaks of a permit which is not "specifically directed" to a particular defined operation, yet "includes" that operation, is left unexplained. We are dealing with a statute which is very plain and straightforward in its directions about permits and suggests no such nebulous concepts. I had supposed from my reading of the statute that the legislature has said that a permit must be directed specifically to a particular operation, and that a permit to operate between Portland and Salem, for example, was not a permit to operate wholly or exclusively (whichever word may be preferred) within the city of Portland, simply because the carrier might have to travel through Portland in order to get to Salem. The court appears to be talking about something that at one and the same time is a permit and not a permit. It has created a new sort of permit, unknown to the law, except as the law is whatever this court says it is.

It is asserted in the court's opinion that as to

Berry's "local cartage operations (along with and as an integral part of its over-all operations as a common carrier), it was required to and did file rate, fare and charge schedules (§ 115-506 (2), OCLA), make annual reports (§ 115-510, OCLA), and pay a tax of 'one (1) mill per combined weight ton mile' (§ 115-517, OCLA)." In so far as this is a statement of fact, there is nothing in the record to support it. In so far as it is a conclusion, based on the court's construction of the statute, then, in my opinion, the plain language of the statute refutes it. None of the cited sections of OCLA had any application to Berry, as I have already shown, until the exemption of local cartage service was removed by the Motor Transportation Code of 1947. Any attempt by the commissioner to have required these things to be done would have been in excess of his powers and unlawful. The statement of the court does not even have the support of the plaintiff, for its counsel says in plaintiff's reply brief:

"* * * The exclusive local cartage operator had never been subjected to regulation, as his operations were exempt. On the other hand, the carrier *who had a permit* authorizing operations within an area already was subjected to complete regulation, *except as to such operations which were exempt.*" (The last italics are mine.)

It is also of more than passing interest to note that, according to the testimony of Mr. T. W. Berry, president of the plaintiff company, he was advised by his attorney (who has had a large experience in this branch of the law) that he had lost his "grandfather rights" by failure to apply for a permit within the 90 days after January 1, 1948, and that he should make application in the ordinary course. It was in pursuance of this advice that the application was filed

which resulted in this litigation. On the printed form prepared by the commissioner the applicant was required to state whether the application was ''for a transfer of authority held by some other permittee, or whether it is a new operation, or an extension or abandonment of present operations''. Berry answered ''extension of operations under Permit AF 37346-1''. The applicant was also required to furnish the following information about the proposed operation: ''Whether contract or anywhere for hire and describe exactly the territory proposed to be served''. Berry answered: ''Anywhere for hire within the city of Portland''. This application is a recognition by Berry that it had no permit for the proposed operation and that the statute means what the commissioner had already interpreted it to mean.

Further, I cannot forbear to comment upon the curious shape which this litigation has taken on. It commenced as a proceeding before the commissioner to obtain a permit in which the applicant undertook to make the showing required by the statute. The commissioner by his findings decided just two questions: that the proposed operation was not in the public interest and that the applicant was an habitual violator of the Motor Transportation Code. He therefore denied the application. The case now winds up in the Supreme Court, where it is held that the plaintiff does not need the permit which the proceeding was commenced to obtain, and the only questions presented to the commissioner and decided by him are ignored. Of course, if the plaintiff held the required permit and the commissioner was attempting unlawfully to prevent it from exercising its rights thereunder, the courts would be open to plaintiff to obtain relief; but I seriously question whether it would be through the

procedure provided by the Uniform Practice Act of Public Utilities Commissioner, ORS 756.505 et seq.

As to the questions upon which the commissioner passed, I deem it sufficient for me to state my conclusion that there is substantial evidence to support his finding that the proposed operation was not in the public interest and the court, therefore, has no authority to disturb his order. *Pacific Tel. & Tel. Co. v. Flagg,* 189 Or 370, 383, 384, 220 P2d 522, and cases cited. The decree of the late Judge Kimmell, who tried the case below, should be affirmed.

A majority of the court have, in my opinion, fallen into serious error in this case, partly, I think, because they have not given adequate consideration to other provisions of the statute than the one primarily involved and to the general scheme of the Motor Transportation Code. A court which treats a particular provision of a statute as though it were a waif without known parents, relatives or associates, is likely to miss the meaning of the particular provision. This court has recently emphasized the necessity of considering a statute as a whole in order to ascertain the meaning of a part. *Lommasson v. School District, No. 1,* 201 Or 71, 261 P2d 860, 267 P2d 1105. As someone has said: "A text without a context is a pretext." In this case the court has, I fear, for the moment forgotten the importance of the principle implicit in that aphorism.

I am authorized to say that Mr. Justice WARNER concurs in the foregoing opinion.

BRAND, J., dissenting.

I join in the dissent of Mr. Justice LUSK, which is not only lucid, but in my opinion, unanswerable. I shall add only a brief comment.

The majority opinion, speaking of local cartage operations, expressly states that "plaintiff's permit was not specifically directed to local cartage operations, because no such permit was required". It is obvious that a permit granted by public authority operates to make lawful certain acts which would be unlawful if done without the permit. A permit, the terms of which authorized a person to walk on the public street, or to eat his breakfast, would be utterly void. Permission imports the power or authority of refusal. *Caldwell v. Workmen's Compensation Appeal Board,* 117 W Va 706, 188 SE 122. As a noun, the word permit connotes the power to grant or withhold. *Didlake v. Standard Insurance Company,* 195 F2d 247. Again, a permit is defined as a written license or permission given by a person or persons having authority. *Lazich v. City of Butte,* 116 Mont 386, 154 P2d 260. A permit is a license granted by a competent authority by which some restraint or illegality is removed. *Gordy v. Maestri,* 170 L2 282, 127 So 628.

If Berry Transport, Inc., could have lawfully conducted intracity transportation without any permit, then the permit could not possibly be construed as authorizing what could be done without authorization. How then can the majority say, as they do, that "Such operations [i.e., intracity] are fully authorized under the permit it held at the time the 1947 Act was adopted, and now holds  *  *  *." The majority statement, first, that no permit was required, and second, that intracity operations are fully authorized under a permit which was not required and which therefore could not authorize the doing of the acts in question, constitutes a basic contradiction which is beyond my power of comprehension.