Argued September 14, affirmed October 26, 1955

# FEERO ET AL *v.* HOUSLEY ET AL

288 P. 2d 1052

*Nicholas Jaureguy* argued the cause for appellants. On the brief were Cake, Jaureguy & Hardy, of Portland.

*Leland F. Hess* argued the cause for respondents. On the brief were Hess & Hess, of Portland.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, BRAND and LATOURETTE, Justices.

TOOZE, J.

This is a suit for an injunction and other relief, brought by Miles H. Feero and others, as plaintiffs,

against J. M. Housley, Jane Doe Housely, his wife, A. G. Ingalls, G. F. Reynolds, and American Guaranty Life Insurance Company, a corporation, as defendants. From a decree in favor of plaintiffs, the defendants J. M. Housley, Jane Doe Housely (whose true name is Leonora M. Housely), A. G. Ingalls, and G. F. Reynolds appeal.

The defendant American Guaranty Life Insurance Company, hereafter referred to as the company, is an Oregon corporation, and the plaintiffs are "class A" stockholders thereof. The defendants J. M. Housely, A. G. Ingalls, and G. F. Reynolds are officers and "class B" stockholders and were the promoters of said company.

The company was incorporated about August 1, 1951, under the provisions of the insurance code of this state, which provides for the incorporation of domestic insurance companies. §§ 101-412 to 101-421, OCLA. (In this opinion we shall omit references to ORS, because in 1953, when it was enacted, a new and complete insurance code was also enacted which replaces, and, in some instances, makes changes in the prior laws, and which is not applicable to this case.) The company's purpose, as stated in the articles of incorporation, "is to conduct the business of writing and selling Life, Accident and Health, and Hospitalization Insurance as defined and contemplated in Title 101, Chapters 5, 8, and 9, Oregon Compiled Laws Annotated, and to carry out such necessary functions incidental to this purpose."

Articles VII, VIII, IX, and X of the articles of incorporation provided as follows:

## "ARTICLE VII

"The authorized capital stock of this corporation shall be Two Hundred Thousand and no/100

Dolars [sic] ($200,000.00), nineteen-thousand eight-hundred (19,800) shares of which shall be designated as 'Class A' stock of the par value of Ten and no/100ths Dolars [sic] ($10.00) per share, and twenty-thousand (20,000) shares designated as 'Class B' stock of the par value of 10/100th Dollars ($.10) per share.

## "ARTICLE VIII

"The incorporators, in order to comply with the provisions of Section 101-124 Oregon Compiled Laws Annotated pertaining to the requirement of paid-up capital and surplus, may sell the shares of 'Class A' stock as designated above at a price in excess of the par value. The amount in excess of Ten and no/100ths Dollars ($10.00) shall be considered a contribution to surplus.

## "ARTICLE IX

"The holders of the 'Class A' stock as designated above shall be entitled to an annual cumulative dividend of six percent (6%) on the par value of such stock in addition to such dividend as the Board of Directors of the said corporation may declare on 'Class A' and 'Class B' stock. Any additional declaration of dividends to 'Class A' and 'Class B' stock shall be equal on a share for share basis.

## "ARTICLE X

"In the event of liquidation of the corporation, the holders of 'Class A' stock shall be first entitled to the cumulative annual dividend of six percent (6%) on the par value of the stock. Assets shall then be distributed on the basis of par value of the stock until the par value shall be paid. Any assets then remaining shall be distributed to all stockholders on a share for share basis."

Upon the filing of the articles of incorporation with the insurance commissioner, and after receipt by the commissioner of the certificate of the corporation com-

missioner that they were in accordance with law (§ 101-402, OCLA), the insurance commissioner issued a permit to the company to solicit subscriptions for stock and otherwise proceed with the organization of the corporation. There is no contention that the organization was not accomplished according to the required procedure, but plaintiffs contend, and the trial court held, that the issuance by the company of more than one class of stock was contrary to law, and that the class B stock should be canceled. These are the questions presented to us on this appeal.

It will be observed that the articles of incorporation provided for a capitalization of $200,000, to be raised by the sale of two separate classes of stock. The principal portion of the capital; to-wit, $198,000, was to be provided by the sale of 19,800 shares of the class A stock of the par value of $10 per share; the remainder; to-wit, $2,000, was to be provided by the sale of 20,000 shares of the class B stock of the par value of 10 cents per share. Authority is granted to sell class A shares at a price in excess of the par value of $10 per share, the sum received over par value to be considered as a contribution to surplus. Each share of stock, both the A and the B, was to have one vote in the affairs of the company. The class A stock was entitled to an annual cumulative dividend of six per cent on the par value, which dividend was to be paid before any other dividends were paid to other stockholders. Any further dividend as might be declared by the board of directors was to be divided between the holders of the A and B stock on a share for share basis.

That was the scheme adopted by the promoters of the company for its organization. They immediately subscribed for the full issue of 20,000 shares of class B

stock, at a total cost to them of $2,000. This gave them complete control of the company and its affairs. With that stock, they were able to vote themselves to be three of the five members of the board of directors, and also to elect A. G. Ingalls as president, J. M. Housley as vice-president, and G. F. Reynolds as secretary-treasurer of the corporation. Under the articles of incorporation, it was impossible to sell class A shares of stock in such number as to match or overcome the voting power of the 20,000 shares of class B stock.

The company authorized and directed the sale of the class A stock at the price of $20 per share, $10 of the amount received to be considered a contribution by the purchaser to the surplus of the corporation. This stock was sold in varying amounts to a large number of persons, most of whom lived in Douglas county, Oregon. The stock-selling campaign operated out of Roseburg. By November 10, 1951, enough stock had been sold to raise the amount of money necessary under the insurance code; viz., $150,000, to commence business. § 101-412, OCLA. It is unnecessary for us to discuss some of the sharp practices indulged in by the sellers of this stock in accomplishing the sales, but the record is rife with instances of more or less shady conduct on the part of some of the salesmen. All the authorized issue of class A stock was not sold.

However, on November 10, 1951, at a meeting of the shareholders of the company held in the city of Portland, the following resolution was adopted:

"RESOLUTION

"WHEREAS the stockholders of the AMERICAN GUARANTY LIFE INSURANCE COMPANY met in the office of the said Company at 715 Broadway Building, in Portland, Oregon, at

noon (twelve o'clock) on November 10th, 1951, and the Meeting was previously duly called by A. G. Ingalls one of the incorporators, at the request of J. M. Housley, the President of the incorporators, and notices of the Meeting were sent to each of the stockholders by the said A. G. Ingalls, under date of November 2nd, 1951, of the time and place of the said meeting by forwarding the same in the United States mails to the addresses of the stockholders as contained upon their respective stock subscriptions, and shareholders representing more than a majority of the stock subscribed were present, and

"WHEREAS stock subscriptions amounting to $161,040.00 were accepted at the said meeting and it was moved and seconded that the following resolution be adopted, and the said Motion was carried unanimously:

"WHEREAS it was ascertained from the Report of the temporary secretary of the incorporators that the said corporation has in its possession a Certificate of Deposit in the Douglas County State Bank, a banking corporation in Roseburg, Oregon, in the sum of $147,640.00 to which the corporation is entitled, at such time as a permit is issued by the Insurance Commissioner of the State of Oregon, to engage in the insurance business, and

"WHEREAS the corporation is in possession of $13,400.00 of real estate mortgages with documents evidencing the appraisal of the property mortgaged as required by law, with title insurance policies as evidence of title, and fire insurance policies insuring the improvements upon the said property, payable to the said corporation, and

"WHEREAS it is the desire of the stockholders assembled, to transfer the sum of $19,640.00 of the above fund, which is contained in the surplus fund, which said surplus fund as per the stock subscriptions amounts to $80,520.00, to the unimpaired capital account to be hereafter considered capital or capital stock in order to satisfy the requirements of

the Statutes of the State of Oregon that there be in the capital stock account $100,000.00.

"NOW THEREFORE BE IT RESOLVED by the Shareholders at the said Meeting that the sum of $19,480.00 be transferred from the surplus account to the Capital account and that this said sum of money, in addition to $80,520.00 heretofore in the capital account as per the stock subscriptions, shall remain intact and unimpaired as capital stock and invested in accordance with the Statutes of the State of Oregon for the investment of the unimpaired capital stock account and that a copy of these Resolutions be filed with the Insurance Commissioner of the State of Oregon in order to show the capital structure of the said corporation.

"Dated this 10th day of November, 1951."

Under date of December 19, 1951, the company was duly authorized by the insurance commissioner to commence the operation of its business, and it immediately began the sale of policies of insurance, and has continued in business since.

Later, after the company had been organized for a year, the articles of incorporation were amended to provide for a third class of stock. The amendment provided that from and after its date, the class A stock would be sold without the cumulative feature as to dividends, and denominated this as "Class A noncumulative" stock. This stock was to be sold at prices ranging between $30 and $35 per share. The amendment specifically provided:

"'Class A' stock hereafter issued shall not be entitled to cumulative dividends, but shall be entitled to dividends on a share for share basis after the 6% cumulative dividends have been paid on such previously issued 'Class A' stock."

The amendment did not change the number of shares of class A stock authorized to be issued under the

original articles; it remained at 19,800 shares with a par value of $10 per share.

At the time this suit was commenced, the total investment in the company was approximately $280,000, represented by class A cumulative, class A noncumulative, and class B stock. The $280,000 represented the investment in approximately 12,654 shares of the class A stock, cumulative and noncumulative. Two thousand dollars represented the investment in 20,000 shares of class B stock. Voting control was, as before noted, concentrated in the promoters, the holders of the class B stock, if their stock was voted in concert. So long as the directors who owned the B stock continued in accord with each other, they could effectively perpetuate themselves in office and ignore any of the wishes of the holders of the class A stock, which stock actually represented the capital investment in the company, and which provided it with the necessary capital to do business. They could prevent any amendment to the articles of incorporation that would change the device employed by them to secure control of a large investment at insignificant cost to themselves.

In addition to the control over the corporate affairs which the meager investment of the appealing defendants gave to them, it also is obvious that they were entitled to a disproportionate share in the profits which would be realized from the business of the company. A few minor arithmetical computations will serve to illustrate more clearly the bonanza incident to the class B stock ownership.

Ten thousand shares of the class A cumulative stock sold at $20 per share represented an investment to the holders thereof of $200,000. Two thousand six hundred fifty-four shares of class A noncumulative stock sold at $35 per share represented an investment of $92,890.

Finally, there are the 20,000 shares of class B stock at 10 cents per share, with an investment of $2,000 only. Adopting as a basis of computation a return rate of 6% net on all the invested capital, it is apparent that the company would have available for distribution $17,693.40 as dividends.

From this figure is subtracted $6,000 to be paid to the class A cumulative stockholders, computed upon the basis of 6% on the par value of that stock, which is $10 per share, although $20 per share was paid for it. There is then left the sum of $11,693.40 to be distributed on a share for share basis among all the stockholders, class A included. The result is that there would be available for distribution a fraction less than 36 cents per share. Added to the 60 cents guaranteed to the class A stockholders, they would receive a total of 96 cents per share, or a total return on their actual investment of $20 per share of 4.8%. The class A noncumulative shareholders fare even worse. They paid $35 per share and receive 36 cents per share, or .97% on their investment. The class B stockholders, on the other hand, receive 36 cents on a 10-cent investment, or 360% on their money.

From the foregoing it is evident that these appealing defendants engaged in a promotional and rather clever scheme calculated from the outset to put completely within their control assets totalling nearly $300,000 at an initial and total expense to themselves collectively of a mere $2,000. The artifices employed to consummate the plan display all the characteristics of over-reaching, sharp practices, and fraudulent and inequitable conduct, which, although perhaps technically lacking the elements of actionable fraud, nevertheless are sufficient to cause a court of equity to view them with disdain.

The contention of plaintiffs is that, although the company has been authorized by the insurance and corporation commissioners of this state to issue and sell two or more classes of stock, still such authorization is contrary to statute and, therefore, void and of no effect. Plaintiffs also maintain that it violates the public policy of this state. It will be unnecessary for us to discuss the question of public policy as raised by plaintiffs, for we are of the opinion that the question is answered directly by specific statute.

Section 77-227, OCLA, as amended by ch 178, Oregon Laws 1941, provides in part as follows:

> "Every stock corporation, *except* building and loan associations and *corporations organized for the purpose of carrying on the business of insurance or suretyship,* shall have power to create two or more classes of capital stock, with such designations, preferences and voting powers, or restrictions of qualifications thereof, as shall be stated and expressed in the articles or supplementary articles of incorporation  *  *  *." (Italics ours.)

Prior to the amendment of 1941, § 77-227, OCLA (as enacted by ch 291, Oregon Laws 1925), read as follows:

> "Every stock corporation, except trust companies, building and loan associations and corporations organized for the purpose of carrying on the business of banking, insurance or suretyship, shall have power to create two or more classes of capital stock,  *  *  *."

By the amendment of 1941, trust companies and banking corporations were removed from the provisions of the statute, but building and loan associations and corporations organized for the purpose of carrying on the business of insurance or suretyship remained subject thereto.

Much of defendants' brief is devoted to a discussion of rules for statutory construction, which they claim are applicable to an interpretation of the statute in question. We have no fault to find with the rules as stated by defendants, but we do deny their application to a construction of this statute.

■■ In our opinion, the language used in the statute is perfectly plain, understandable, and wholly unambiguous. Being such, the legislative intent must be and is gathered therefrom. It is presumed that the legislature meant precisely what its words imply. Such being the case, we are not permitted to resort to rules of statutory construction in interpreting the statute. *Berry Transport, Inc. v. Heltzel,* 202 Or 161, 165, 272 P2d 965; *State ex rel. Dental Assn. v. Smith,* 201 Or 288, 291, 270 P2d 142; *Gooch et al. v. Rogers et al.,* 193 Or 158, 191, 238 P2d 275; *Fox v. Galloway,* 174 Or 339, 347, 148 P2d 922.

■ By the plain words of this statute, it is manifest that the legislature intended that building and loan associations, insurance companies, and corporations engaged in the business of suretyship should not issue two or more classes of stock. The effect of the statute is to prohibit the issuance of two or more classes of stock by the excepted corporations. Neither the corporation commissioner nor the insurance commissioner had any authority to approve the issuance and sale of two or more classes of stock by the defendant American Guaranty Life Insurance Company, and the provision therefor in the articles of incorporation is contrary to law and, therefore, void and of no effect.

■ It is beside the issue to argue that in the absence of statutory prohibition, all stock corporations may as a general rule issue and sell two or more classes of stock, if provision therefor is made in their articles of

incorporation. There is nothing inherently wrong in the issuance and sale of two or more classes of stock. 18 CJS 651, Corporations, § 222c. However, we venture to say that no one would seriously contend that the legislature does not have the power to prohibit such issuance or sale by Oregon corporations, some or all of them.

Under the present statute all stock corporations, excepting the three mentioned in the Act, are expressly empowered to provide for the issuance and sale of two or more classes of stock. That power is withheld from the three types of corporations.

Defendants argue that if the above statute be construed as depriving insurance companies of the power to issue two or more classes of stock, then the statute is void as violating Art. IV, § 20, of the Oregon constitution: "Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title * * *."

The title to ch 291, Oregon Laws 1925 (§ 77-227, OCLA), reads as follows:

## "AN ACT

"Relating to corporations and to the payment of dividends thereby, and to the capital and capital stock of corporations; amending section 6873, Oregon Laws, relating to liability of directors of corporations for certain acts; amending section 6877, Oregon Laws, relating to increase and decrease of the capital stock and to the dissolution of corporations; amending section 6881, Oregon Laws, relating to supplementary articles of incorporation; and amending sections 1, 2, 3, 4, 5 and repealing section 6, chapter 182, General Laws of Oregon, 1923, entitled 'An act relating to corporations and providing for the issue of shares of capital stock of more than

one class and of shares without nominal or par value.' "

Defendants invite attention to the title of ch 182, Oregon Laws 1923, supra.

They then argue:

"In the present case, the title of the original act, as shown above, stated that it related to 'the issue of shares' of more than one class. A person, particularly if cognizant of the fact that under the preexisting law, whether statutory or common law, a corporation could issue two or more classes of stock, would not by this title be put on notice—not by any stretch of the imagination—that the issuance of such stock was being *prohibited* by the statute.

"We do not mean by what we say above to imply that the title of an act must disclose that provisions in the act itself are subject to exceptions. But the reason this is so is because an exception, as explained above, merely withholds the excepted matter from the operation of the statute, leaving it subject to the laws in force prior to the enactment. It is only if, as here, the contention is made that an exception in a statute has a broader effect—i.e., a prohibitory effect—that it is necessary to point out that if such be the case the enactment of such *prohibition* must be mentioned in the title."

In this case we are concerned with the title to the Act of 1925, not with that of the Act of 1923. The first sentence of the 1925 title states specifically that the Act relates to "corporations * * *, *and to the capital and capital stock of corporations*". (Italics ours.)

■ The question now presented to us by defendants is fully answered by *Foeller v. Housing Authority of Portland,* 198 Or 205, 255, 256 P2d 752, in which case Mr. Justice ROSSMAN, speaking for the court, fully discussed the constitutional provision which is again

brought to our attention. We can add nothing to what was there said. In that case we again quoted with approval from the case of *Johnson v. Harrison,* 47 Minn 576, 50 NW 924, 28 Am St Rep 382, as follows:

" ' * * * The term "subject", as used in the Constitution, is to be given a broad and extended meaning, so as to allow the legislature full scope to include in one act all matters having a logical or natural connection. * * * All that is necessary is that the act should embrace some one general subject; and by this is meant merely that all matters treated should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.' "

■ It is clear that express authority conferred upon some corporations to issue two or more classes of stock, and denying it to others, is germane to the subject of "capital and capital stock of corporations", and properly connected therewith. We are of the opinion that the title was sufficient to meet the constitutional demand.

Defendants assign as error the action of the able trial judge in decreeing that the class B stock was void and should be canceled.

Defendants point out to us that the class B stock was fully subscribed for and the consideration therefor paid prior to the taking of any subscriptions for class A stock, although the stock certificates for all this stock were issued on the same day, December 20, 1951, and contend that if any stock is to be held valid, it must be the class B stock which was first issued. Defendants in their brief state their position as follows:

" ' * * * The 'Class B' stock, held by the trial judge to be invalid, was, as already explained, sub-

scribed and paid for prior to any subscriptions for any other class of stock. While the actual stock certificates were not issued until later, this is of no importance. The law is clear that one becomes a stockholder of a corporation when his subscription is accepted by the corporation, not when the actual certificate is issued. Accordingly, those who subscribed for this stock then became stockholders of the corporation. If the corporation had the power to issue any valid stock, this was it.

"If the corporation had the power to issue one class of stock, but did not have the power to issue two or more classes of stock (which seems to be the contention), then it certainly follows that this stock, first issued, was the valid issue and that the stock later issued was invalid. The validly issued stock could not become invalid by reason of later subscriptions to other classes of stock. It is like an *oversubscription* to stock, in which case it is only the stock included in the oversubscription, not that issued within the authorized limits, that is invalid.

"Accordingly, if this court should agree with the trial court's decision that this corporation had no lawful power to issue more than one class of stock, we submit that it must further hold that the stock first issued, the 'Class B' stock, is the valid stock."

Ordinarily, there would be merit in defendants' contention, but not so under the peculiar facts and circumstances of this case. Although the class B stock was used for the purposes of preliminary organization of the corporation, as a part of defendants' scheme, nevertheless, it was the class A stock that breathed the breath of life into the company and enabled it to commence the business for the transaction of which it was formed. It is the lifeblood of the corporation. Plaintiffs gave value received for the only stock of the

corporation that has real substance, and were innocent purchasers thereof. Not only are plaintiffs' interests involved, but also those of a large number of policy-holders. On the other hand, the class B stock was designed solely for the purpose of enabling defendants to carry out their wrongful plans, and was the means actually employed by them to that end. It is tainted with their wrongdoing. In truth, it served the purpose merely of form and not of substance.

■ This is a suit in equity, and equity once having taken jurisdiction, its arm is long and far-reaching. Equity always regards the substance rather than the form. It never concerns itself much with the interests of wrongdoers. As a matter of simple justice, defendants should not be permitted to reap the benefits of their fraudulent conduct by having the validity of the class B stock confirmed. Equity and good conscience demand that the validity of the class A stock be upheld. This will leave the company as a going concern; not a wrecked institution as might result if the class B stock were held to be the only valid stock. At most, defendants are entitled to a return of their investment of $2,000. Were they plaintiffs instead, asking for affirmative relief, they would not even be entitled to that. The trial court did not err in canceling the class B stock and in directing a return to defendants of the $2,000 paid by them for that stock.

The decree is affirmed.