Submitted on briefs April 18, reversed and remanded April 27, 1922.

## STATE v. GATES.

(206 Pac. 863.)

**Fish—Commission Authorized to Close Waters North of Suspension Bridge in Willamette River.**

1. By Laws of 1921, page 156, Section 116, as amended by Laws of 1921, page 779, Section 1, and Laws of 1921, page 267, designated as "Commercial Fisheries Code of Oregon," the State Fish Commission is vested with authority to prevent net fishing for salmon in the Willamette River north of the suspension bridge.

**Statutes — Absurd or Mischievous Construction Disregarded for That Which is Reasonable and Wholesome.**

2. If the language of a statute admits of two constructions, one absurd or mischievous and the other reasonable and wholesome, courts will adopt the latter construction.

**Statutes—Interpreted According to Legislative Intent Ascertained from Whole Statute and Consideration of Mischief to be Remedied.**

3. Statutes should be interpreted according to the legislative intent to be ascertained from the whole statute and a consideration of the mischief which it was designed to remedy.

**Statutes—To Prevent Absurdities, Literal or Natural Meaning Disregarded.**

4. To prevent absurdities, and give effect to legislative intent, words will not be given their literal or natural meaning if such meaning leads to an absurd conclusion.

**Fish—Commission's Authority to Close River Includes Stocked Fish and Fish Spawned Naturally.**

5. By Laws of 1921, page 159, Section 8, the authority of the Fish Commission to close waters of the state to fishing is not limited to fish spawned naturally, but includes stocked or planted fish.

From Clackamas: JAMES U. CAMPBELL, Judge.

In Banc.

A complaint was filed in a Justice's Court alleging that the defendant Charles Gates on January 4, 1922, fished with a net for salmon in the Willamette River north of the suspension bridge which crosses the river at Oregon City; the river north of the suspension bridge being at that time closed to commercial fishing by order of the State Fish Commission. The complaint also alleges that the portion of the stream so ordered to be closed "was frequented by salmon." A demurrer to the complaint was overruled. A trial terminated in a conviction; and the defendant appealed to the Circuit Court, and there the demurrer was sustained. The plaintiff then appealed to this court.            REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. I. H. Van Winkle,* Attorney General, and *Mr. L. Stipp,* District Attorney.

For respondent there was a brief over the name of *Mr. Gilbert L. Hedges.*

HARRIS, J.—1. The sufficiency of the complaint depends upon the validity of the order of the Fish Commission. The defendant makes two contentions He claims: (1) That the Fish Commission was without authority to make a valid order affecting the Willamette River north of the suspension bridge; and (2) that, even though it be assumed that the Fish Commission had authority to make an order, its authority was limited so that it could do no more than to prohibit the catching of "stocked salmon."

104 Or.—8

The first contention arises out of the fact that Section 116, Chapter 105, Laws of 1921, was amended by Chapter 397, Laws of 1921; and the second contention is based upon the language of the last sentence appearing in Section 8, Chapter 105, Laws of 1921. These two contentions cannot be clearly understood unless we first direct attention to the order made by the Fish Commission, and then recite the history of legislation affecting the subject matter here involved.

Under date of May 10, 1921, after reciting that the Fish Commission "has propagated and stocked, and is propagating and stocking the waters of the Willamette River and the Willamette Slough within the State of Oregon, with salmon and other food fish," and "the Willamette River and the Willamette Slough are frequented by salmon and other food fish, and for the purpose of protecting the same the said Fish Commission of the State of Oregon has decided to close certain waters of the Willamette River," the Fish Commission gives notice that the waters of the Willamette River north of the suspension bridge are "closed to net fishing or fishing for commercial purposes by any means, for salmon and other food fish, from and after the sixth day of June, 1921, until said waters are again opened to said fishing for salmon and other food fish * * ." We understand that the defendant concedes that the order made by the Fish Commission was published in full compliance with the requirements of the statute. The defendant is not claiming that the legislature is without power to confer upon the Fish Commission authority to close a given stream against fishing; but the controversy is confined to the contention that the legislature has evinced an intention to deprive the Fish Commission of authority to close

the Willamette River north of the suspension bridge, and to the contention that, even though it be held that the legislature did not deprive the Fish Commission of all authority to close the designated portion of the Willamette River, it nevertheless limited the commission's authority to close that part of the river only to fishing for such salmon fish "as had been stocked" in that stream.

In 1921 the legislative assembly revamped the fish and game legislation. A state game commission was created; and to this commission was given authority to enforce all laws respecting the protection, preservation and propagation of game fish, game animals, fur-bearing animals, game birds and nongame birds within the state: Sections 1 and 2, Chapter 66, Laws 1921. See, also, Chapter 153, Laws 1921. A commission to be known as the Fish Commission of the State of Oregon was created; and upon this commission was conferred "sole jurisdiction over all salmon fish of all varieties (except trout) as defined by the laws of Oregon, and all other anadromous and food and shell fish within the waters over which the State of Oregon has jurisdiction": Section 7, Chapter 105, Laws 1921.

The legislation of 1921 concerning game and game fish is so complete that it has been appropriately described as the Game Code (Section 68, Chapter 153, Laws 1921); and with like propriety Chapter 105, Laws of 1921 is designated "Commercial Fisheries Code of Oregon."

The power conferred by Section 8, Chapter 105, Laws of 1921, is not a new and novel legislative expression; nor is the policy manifested by Section 116, Chapter 105, as amended by Chapter 397, Laws of 1921, a new legislative policy. Section 8 and Section 116 of Chapter 105 read as follows:

"Section 8. Commission may Establish Deadlines. The fish commission is authorized by this act to propagate and stock the various streams of this state with salmon, sturgeon, shad or other food or shell fishes, not inimical to or destructive of such fish; and for the purpose of protecting the same, the fish commission is hereby authorized to close to net fishing, or fishing for commercial purposes by any means, any stream, or any designated portion thereof, in this state frequented by salmon, sturgeon, shad or other food or shell fishes, or any stream which it has stocked, and prevent any person from taking or fishing for or catching any salmon, sturgeon, shad or other food or shell fishes therein, except that portion of the Columbia river west of the mouth of the Deschutes river. Should the fish commission desire to close to net fishing, or fishing for commercial purposes by any means, any stream, or designated portion thereof, frequented by salmon, sturgeon, shad or other food or shell fishes, or any stream or designated portion thereof which it has stocked with said food or shell fishes, it shall cause notice thereof to be filed in the office of the county clerk in each county in which such stream or designated portion thereof lies, and shall publish such notice in some public newspaper published at the county seat in such county or counties for two successive weeks. Such notice shall designate as nearly as practicable the stream or designated portion thereof to be closed, and shall state that on and after a date therein stated it will be unlawful to fish for or take or catch with net, or by other means for commercial purposes, any salmon, sturgeon, shad or other food or shell fishes therein, which date shall not be less than fifteen days from the date of the first publication, and shall cause like notices to be posted for such time in three conspicuous places on the banks of such streams or designated portions thereof. Upon the completion of the publication of such notice, the same, with proof of the publication and posting thereof, shall be filed with the original notice in the office of the county clerk or clerks, and

it shall be unlawful at any time after the expiration of the date specified in said notice for any person to fish for, catch or take any salmon, sturgeon, shad or other food or shell fishes stocked therein, until notice shall be filed and likewise published by the fish commission of the opening of such stream or designated portion thereof to the public for fishing.''

''Section 116. Willamette River.—It shall be unlawful to take or fish for salmon, shad or sturgeon or other food fish in the Willamette river or its tributaries north of the south line of section eleven (11), township two (2) south, range one (1) east of the Willamette meridian, by any means whatsoever, except with hook and line, commonly called angling, from March fifteenth, noon, to May first, noon, and from June fifteenth, noon, to November first, noon, in any one year. It shall be unlawful in the Willamette river or any of its tributaries south of the south line of section eleven (11), township two (2) south, range one (1) east of the Willamette meridian, to take or fish for said fish by any means whatsoever, except with hook and line, commonly called angling. It shall be unlawful for any person to take or catch more than three salmon in any one day with hook and line in any portion of said river, and it shall be unlawful for any person to sell or offer for sale any salmon taken with hook and line during the closed season for net fishing for salmon; and provided further, that all persons engaged in fishing for salmon with hook and line shall not have more trolling or angling outfits in use in any one boat than there are occupants of the same boat.''

Section 116, Chapter 105, Laws of 1921, is exactly the same as the language of Chapter 397, Laws of 1921, except in the following four particulars: (1) In the former a section line is prescribed as the base line, while in the latter the suspension bridge is adopted as the base line; (2) in the former the first annual closed period begins with March 15th and ends with May 1st, while in the latter it ends

with May 10th; (3) in the former the second annual
closed period begins with June 15th and ends with
November 1st, while in the latter it ends with De-
cember 1st; and (4) in the former the words "said
fish" are used in that part of the section which de-
clares it to be unlawful to fish south of the suspen-
sion bridge, while in the latter the words "salmon,
shad and sturgeon or other food fish" are employed;
but it must be remembered that the words "said
fish" appearing in the former relate back to the
words "salmon, shad or sturgeon or other food fish,"
and consequently Section 116 in its original form
is the same as it is in its amended form except that
a different base line is fixed and the two annual
closed periods end at different dates.

The legislative policy of prescribing annual closed
periods for the Willamette River and other streams
frequented by salmon, and of authorizing the Fish
Commission to extend the statutory closed periods
began as early as 1901 and has continued without
interruption to the present time. In 1901 the legis-
lature declared it to be unlawful to fish for salmon
in the Willamette River north of the falls except with
hook and line, commonly called angling, from March
1st to April 15th and from June 15th to November
1st and from 6 P. M. Saturday to 6 P. M. on Sunday in
any week. Section 5, Laws 1901, p. 329 codified as
Section 4063, B. & C. Compilation, and Section 5239,
L. O. L. By the same statute of 1901 the legisla-
ture empowered the board of fish commissioners

"to close any stream or any designated portion
thereof in this state frequented by salmon, or any
stream which they have stocked, and prevent any
person taking or fishing for or catching any salmon
or food fishes therein. Should the board of fish
commissioners desire to close any stream or desig-

nated portion thereof frequented by salmon, or any stream or designated portion thereof which they have stocked with food fish, they shall cause notice" to be given; and it shall then be unlawful "for any person to fish for, catch or take any salmon, or any food fishes stocked therein," until notice is given of the opening of such stream. Section 45, Laws 1901, p. 345, codified as Section 4106, B. & C. Compilation, and as Section 5316, L. O. L. In 1905 Section 5 of the act of 1901 was slightly amended as to the closed periods (Chapter 133, Laws 1905); but with this exception there was no legislation affecting either Section 5 or Section 45 of the act of 1901 until 1913, when chapter 139, Laws of 1913, was enacted.

The act of 1913 affected no then existing legislation except Section 5239, L. O. L. (Section 5 of the act of 1901) and section 5316, L. O. L. (Section 45 of the act of 1901.) By the act of 1913 Section 5 was amended so as to produce a slight change in one of the closed periods. Section 45 was amended so as to except from its operation

"that portion of the Columbia River west of the mouth of the Deschutes River, and that portion of the Willamette River north of the Willamette Falls at Oregon City";

but with this exception Section 45 read exactly the same after the amendments as it did before. In other words, the board of fish commissioners had authority prior to the act of 1913 to extend the statutory closed season for salmon as to any stream in the state, but after the act of 1913 the board was authorized to close any stream except the designated portion of the Columbia River and the specified part of the Willamette River.

Section 5239, L. O. L., was amended in 1915 so as to change the base line, and so as to make a slight

change in one of the closed periods; but with this
exception the act of 1913 was not effected by any
legislation until 1917. By force of Chapter 223,
Laws of 1917, approved by the legal voters on No-
vember 5, 1918 (see Laws 1919, p. 8), Section 5239,
L. O. L., was amended and a designated section line
was fixed as the base line.

By force of chapter 400, Laws of 1917, Section
5316, L. O. L., was amended. The amendatory act
of 1917 conferred closing authority upon "the board
of fish and game commissioners," extended the time
required for the publication of notice and used the
word "other" with reference to "food fishes"; but
otherwise the act of 1917 was like the statute of 1913.
The act of 1917 concluded by declaring that "it shall
be unlawful" after the date specified in the notice

"for any person to fish for, catch, or take *any* sal-
mon, *or* any other food fishes stocked therein, until
notice shall be filed and likewise published by the
board of fish and game commissioners of the open-
ing of such stream or designated portion thereof to
the public for fishing."

Section 5316, L. O. L., was again amended by
Chapter 236, Laws 1919. The act of 1919 contains
the added words "to net fishing, or fishing by hook
and line, commonly called angling or both"; but
otherwise the act of 1919 is like the statute of 1917.
With the exception of this statute of 1919, no legis-
lation affecting either Section 5239 or Section 5316,
L. O. L., was enacted subsequent to 1917 until the
adoption of Chapter 105, Laws of 1921.

The act of 1901 prescribed for nearly every one,
if not for every one, of the different streams in the
state frequented by salmon, a definite period during
which such stream was closed to commercial salmon
fishing. The act of 1921 (Chapter 105) prescribes

a closed season for nearly every stream, if not for
every stream, in the state in which salmon may be
found.   Looking back over the history of legislation
concerning salmon, we observe that the legislative
assembly long ago inaugurated and that it has since
maintained two policies: One, of having a definite
annual period or periods during which a given
stream is by statute closed to salmon fishing; the
other, of empowering the board or commission, vested
with jurisdiction over our fisheries, to extend, if
need be, the closed period or periods defined by stat-
ute.   During the periods prescribed by statute a
stream is and must be at all events closed; for the
commission is without power to shorten or abolish
that defined period, although it is authorized to
extend and lengthen that defined period if condi-
tions appear to warrant such extension.   Obviously
Section 8 of Chapter 105, Laws of 1921, continued
the policy of vesting the commission with authority
to extend and lengthen the statutory closed period;
and manifestly Section 116 continued the policy of
prescribing the annual closed periods for that part
of the Willamette River which is here involved.
There is absolutely nothing in the legislation of
1921 to indicate that the legislature intended to de-
prive the Fish Commission of authority to lengthen
the statutory closed periods for the Willamette River.
Section 8 of Chapter 105 excepted from its operation
none of the waters of the state except "that part of
the Columbia River west of the mouth of the Des-
chutes"; and when it is remembered that Chapter
236, Laws of 1919, and Chapter 400, Laws of 1917,
expressly excepted that portion of the main channel
of the Willamette River north of the falls, and that
Chapter 139, Laws of 1913 excepted "that portion
of the Willamette River north" of the falls, the

absence of a like exception in the act of 1921 is equivalent to a demonstration that the legislature deliberately intended to vest the Fish Commission with power to extend the statutory closed periods for that part of the Willamette River which is north of the bridge. Chapter 397, Laws of 1921, accomplished nothing except to change the duration of the statutory closed periods and the location of the base line. Chapter 397 is utterly devoid of any suggestion or intimation that the legislature intended to except the Willamette River from the operation of Section 8 of Chapter 105. By force of the legislation of 1921 the Fish Commission is vested with authority to prevent net fishing for salmon in the river north of the suspension bridge.

The second contention is that if it be decided that the Fish Commission has authority to close the Willamette River to net fishing for salmon, such authority is nevertheless limited to "stocked" salmon. Salmon is an anadromous fish, and is a food fish. When the white man first came to this section salmon were found in the Columbia and in the Willamette Rivers in great numbers. In order to preserve the supply it has been found necessary by means of hatcheries to propagate salmon. Salmon fry are taken from the hatcheries and "planted" in the different streams, including the Willamette River. The salmon fry, whether "planted" in a stream or "spawned naturally" therein, migrate to the sea. At probably the end of four years they return to fresh water to spawn, usually to the stream in which they were originally spawned or planted. The defendant argues that it is not unlawful to catch a salmon which has been "spawned naturally on spawning grounds," and since

"it is absolutely impossible to tell the difference between artificial spawned and planted salmon and one which is spawned naturally in the stream,"

the defendant "may fish for all fishes found in the stream so long as his acts are not inhibited by other laws." This construction makes the statute absurd.

2. Although the legislature may, if it chooses, enact absurd legislation, the courts will always, when examining a statute, begin the inquiry with the presumption that the legislature did not intend to dignify an absurdity with the solemnity attaching to a law. If the language of a statute admits of two constructions, one absurd or mischievous, and the other reasonable and wholesome, courts will pursue the common-sense course and adopt the reasonable and wholesome construction: *State* v. *McGuire,* 24 Or. 366 (33 Pac. 666, 21 L. R. A. 478); 25 R. C. L. 1019.

3. Statutes should be interpreted according to the legislative intent, to be ascertained from the whole statute and a consideration of the mischief which it was designed to remedy: *State* v. *Hyde,* 88 Or. 1, 52 (169 Pac. 757, 171 Pac. 592, Ann. Cas. 1918E, 688); *Warm Springs Irr. Dist.* v. *Pacific Livestock Co.,* 89 Or. 19, 24 (173 Pac. 265).

4. Indeed, in order to prevent absurdities and that effect may be given to the legislative intent, courts will sometimes refuse to give to words their literal or natural meaning, if such meaning will lead to an unreasonable or absurd conclusion, and will adopt some other meaning within the reasonable scope of the words, if it appears that the legislature probably intended such other meaning: 25 R. C. L. 1020.

5. What was the situation confronting the legislature in 1901, and what has been the situation since that time? The canning of salmon has been and is now

one of the principal industries of the state, and hence the preservation of this industry is important. Before and since the coming of the white man salmon have frequented the Columbia and Willamette Rivers and probably all of the coastal streams in the state as well as tributaries of coastal streams. The demand for salmon as a food fish has been so great that natural propagation cannot keep pace with the demand, and so it has been necessary to supplant natural propagation with artificial propagation carried on in state maintained hatcheries. Salmon fry propagated in hatcheries have been planted in probably every stream of the state in which salmon have "spawned naturally on spawning grounds." Although it is possible that salmon have been planted in streams in which before such planting salmon were not "spawned naturally," but few, if any, such streams can be found, for the reason that salmon have always been found in nearly all, if not all, of our coastal streams and such of their tributaries as are not obstructed by insurmountable falls. In other words, it is probably correct to say that every stream which contains or is frequented by planted salmon has always been frequented by salmon which were "spawned naturally." In view of the long-continued policy of the state in the maintenance of hatcheries it is probably accurate to say that every stream in the state, which contains any salmon, contains both "planted" salmon and salmon which have "spawned naturally"; and it is literally accurate to say that the Willamette River is frequented by both classes of the species. "Planted" salmon which have gone to the sea and then at the end of four years return to fresh water do not need any different or other protection than is required for salmon "spawned

naturally.'' It is utterly impossible to distinguish one from the other when they return to fresh water. In these circumstances,—is it not an absurdity to say that the legislature intended to empower the Fish Commission to extend the closed seasons to net fishing for ''planted'' or ''stocked'' salmon, and not for salmon ''spawned naturally''?

When the legislation of 1901 was enacted some species of food fish not indigenous to our streams had been brought from other waters and planted in this state and thus our streams were ''stocked'' with such new species. The legislature evidently assumed that it might be found desirable from time to time in the future to ''stock'' our streams with still other species of food fishes not indigenous to our waters. Naturally the legislature contemplated that it might be necessary to afford protection to new varieties of food fishes introduced into our lakes and streams; and so in the act of 1901 and in subsequent statutes the legislature made provision for the protection of such fishes as well as for native species.

It is not necessary in the instant case to do more than to ascertain the extent of Section 8, Chapter 105, Laws of 1921, as to salmon, for we are not now concerned with any other species of fish. If the closing order involved here had been made under the act of 1901 it would have been applicable to any salmon whether planted or ''spawned naturally''; for in unambiguous and unmistakable terms that statute empowered the board to close ''any stream'' or designated portion ''frequented by salmon or any stream or designated portion thereof which they have stocked with food fish,'' and thereupon it became unlawful to catch *''any* salmon, *or* food fishes stocked therein.'' Obviously the word ''stocked'' did not

relate back to and qualify the word "salmon." The words are "any salmon," and they include all salmon. If such was not the meaning of the act of 1901, then the closing order approved in *Portland Fish Co.* v. *Benson,* 56 Or. 147 (108 Pac. 122), was in excess of the authority of the board.

The title of Chapter 105, Laws of 1921, declares that it is an act designed, among other purposes,

"to provide for the better protection, preservation and propagation of salmon, shad, sturgeon, and other anadromous and food and shell fishes."

The purpose of the act is to provide protection for all salmon, not merely stocked or planted salmon, and also protection for "other" food fishes. Turning again to Section 8 of Chapter 105 we observe that the Fish Commission is

"authorized to close to net fishing * * any stream, or any designated portion thereof, * * frequented by salmon * * , *or* any stream which it has stocked, and prevent any person from * * fishing for * * *any* salmon * * *or* other food * * fishes."

The commission is authorized to close any stream which is frequented by salmon *or* any stream which it has stocked. The commission is also authorized to prevent the catching of *"any* salmon." The authority to prevent is not limited to planted or "stocked" salmon. The statute continues by declaring,

"should the Fish Commission desire to close to net fishing * * any stream or designated portion thereof frequented by salmon * * or other food * * fishes *or* any stream or designated portions thereof which it has stocked with said food * * fishes it shall cause notice" to be given.

The Willamette River is frequented by salmon, and it has also been stocked with salmon; and there-

fore in any view of the statute it is such a stream
as may be closed. The notice must designate the
stream or portion thereof to be closed, and shall
state that

"it will be unlawful to fish for or take or catch with
net * * *any* salmon * * *or* other food * * fishes
therein."

The notice is not that it shall be unlawful to catch
stocked salmon, but that it shall be unlawful to catch
*any* salmon. Section 8 concludes by declaring that
"upon the completion of the publication" of the
notice

"it shall be unlawful * * for any person to fish
for, catch or take *any* salmon * * or other food * *
fishes stocked therein."

Manifestly the word "stocked" does not relate
back to and qualify the words "any salmon," and
the word "stocked" is as devoid of influence upon
the words "any salmon" in the act of 1921 as it
was in the act of 1901. When the legislature pro-
vided for authority to close, it said "any" meaning
all. When the legislature provided for authority
to prevent, it said "any," meaning all. In these
circumstances we could not well expect to find the
same legislature saying that when this all-inclusive
authority to close and this all-inclusive author-
ity to prevent should be exercised, the result
would be only a partial prohibition and not an all-in-
clusive prohibition. If the prohibition extends only
to stocked salmon it would be only a partial prohi-
bition; but if it extends to "any salmon" it is an all-
inclusive prohibition. It seems to us that when
measured by the established rules of statutory con-
struction and by the ordinary rules of grammar,
the statute, so far as it relates to salmon, is sus-

ceptible to only one reasonable construction. The order of the fish commission makes it unlawful to catch "any salmon," whether stocked or "spawned naturally." The legislature authorized the Fish Commission to make such an order, and it is therefore valid.

The judgment is reversed and the cause is remanded to the Circuit Court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.