Argued and submitted on respondent's demurrer to alternative
writ of mandamus August 4, demurrer overruled; peremptory
writ issued August 16, 1972

McALMOND, *Petitioner, v.* MYERS, *Respondent,*
CORBETT, *Intervenor.*

500 P2d 457

*R. Ryan Lawrence,* Portland, argued the cause for petitioner. With him on the brief were Susak & Lawrence, Portland.

*John W. Osburn,* Solicitor General, Salem, argued

the cause for respondent. With him on the brief was Lee Johnson, Attorney General, Salem.

*Dale Pierson,* Salem, argued the cause for intervenor. With him on the brief was Keith Burns, Portland.

HOLMAN, J.

Petitioner is an elector and an unsuccessful candidate in the May 1972 primary election for the Democratic nomination for State Treasurer. He filed an original proceeding in this court for an alternative writ of mandamus directed to Clay Myers, Secretary of State, seeking to require him to omit Alice Corbett's name from the list of Democratic nominees certified for the 1972 general election. Alice Corbett received the highest number of votes for the Democratic nomination for State Treasurer in the primary election. This court issued the alternative writ. In response thereto, the Secretary of State filed a demurrer and Alice Corbett filed a petition to intervene. The petition to intervene was allowed.

The issue sought to be presented is whether Alice Corbett is a qualified candidate for the office of State Treasurer and, therefore, whether the Secretary of State can properly certify her as the Democratic nominee. In May of 1968 she was a candidate in the Democratic primary for the office of State Senator and received the highest number of votes for the position which she sought. However, she was found to have violated the Corrupt Practices Act, ORS ch 260, and was disqualified. *See Cook v. Corbett,* 251 Or 263, 446 P2d 179 (1968). Petitioner claims that Mrs. Corbett's violation of the Act in 1968 disqualifies her from

being a candidate for State Treasurer in 1972. Mrs. Corbett contends that she is qualified, that the petitioner has other adequate legal remedies, and that the Secretary of State has no duty to omit her name from those certified as nominees.[1] Although the Secretary of State demurred to the petition, he takes a neutral position.

■ A writ of mandamus lies to compel a public official to perform his official duties. The first question, therefore, is whether the Secretary of State has a duty to omit from certification the name of a candidate who won the primary election if such candidate is otherwise unqualified.

■ ORS 250.020[2] provides that the Secretary of State shall prepare and deliver to the county clerks a certification of offices and candidates for the general election. ORS 249.460[3] provides that he shall issue a certificate of nomination to the person receiving the highest number of votes in the primary. How-

---

[1] Mrs. Corbett makes no contention (as is advocated in the dissenting opinion) that the application of the disability provided by ORS 260.365 to her present situation does not afford her equal protection of the law and, therefore, is unconstitutional. Relating the length of disability for violation of the Corrupt Practices Act to the length of the term sought by the use of such illegal activity is not an unreasonable classification. Neither is anyone in Mrs. Corbett's position being treated any differently than she is.

[2] ORS 250.020: "The Secretary of State shall, * * * prepare and furnish to each county clerk a certified statement showing the state * * * offices to be filled in the county at the election, and the names and other information concerning all candidates for such offices to be voted on at the election * * *."

[3] ORS 249.460: "* * * The Secretary of State shall, * * * canvass the votes for all officers to be voted for in the state at large * * *. The Secretary of State shall grant a certificate of nomination to the candidate having the highest number of votes for each office and issue a proclamation declaring the nomination of each candidate by his party."

ever, either ORS 249.031 (2)(f)[4] or ORS 249.221 (1)
(f)[5] (depending upon whether he files by petition or
declaration) requires a candidate to file a statement
with the Secretary of State that such candidate will
qualify if elected. The Secretary of State is given the
authority to verify the validity of all such statements.
ORS 249.014.[6] This authority would be meaningless if
it was not contemplated that he would take action if
facts became known to him which show that the can-
didate is unqualified. It is obvious that the Secretary
of State has a duty to withhold certification of a can-
didate who he knows is ineligible, even though the
candidate received the highest number of votes in the
primary election.[7] The Secretary of State necessarily
has knowledge of the opinion of this court which held
that Mrs. Corbett violated the Corrupt Practices Act.
We conclude that if such violation disqualifies her
being elected or serving as State Treasurer in 1972,

---

[4] ORS 249.031 (2)(f): "* * * * *.

"* * * (2) Each petition for nomination shall contain: * * *
(f) A statement that the candidate will qualify if elected. * * *.
"* * * * * *."

[5] ORS 249.221 (1)(f): "(1) Each declaration of candidacy
shall contain: * * * (f) A statement that the candidate will
qualify if elected. * * *.
"* * * * * *."

[6] ORS 249.014: "The Secretary of State, * * * may verify
the validity of the contents of the documents filed in his office as
described in ORS 249.031, 249.221, * * *."

[7] In Pense v. McCall, 243 Or 383, 393, 413 P2d 722 (1966), we
held that a candidate who had filed for office was prohibited from
filing for a second office without first having withdrawn his
initial filing. We said:
"* * * While, in the ordinary case, the Secretary of State
has a ministerial duty to accept a declaration of candidacy
regular on its face * * *; yet there would be no such duty
where the facts showing the illegality of the declarations were
known to the official: * * * [citations omitted]." (dictum).

he has a duty to omit her name from the certification of candidates for the general election.

██ A writ of mandamus may be brought only when there is no other adequate and complete remedy at law. Such a remedy at law did exist at one time. However, it is no longer available to petitioner. ORS 251.025⑧ provides that the nomination of any person may be contested by any elector or by any person who was a candidate for the nomination if the person nominated has violated any provision of the election laws, or is ineligible to hold the office. The contest must be filed in circuit court within ten days after the final canvass of votes.⑨ Petitioner did not avail himself of this remedy. Normally, this would preclude relief afforded by way of the extraordinary legal remedy of mandamus. 2 Spelling, Injunctions and Other Extraordinary Remedies ch XL, § 1380, at 1190 (2d ed 1901). However, we believe such a prohibition from using the writ should not necessarily follow when the right to be vindicated is a public as well as a private

---

⑧ ORS 251.025: "The nomination * * * of any person for or to any office * * * may be contested as provided in ORS 251.015 to 251.090 by any elector entitled to vote for such person or measure at such election, or by any person who was a candidate at such election for the same nomination * * * for any of the following causes and no other:

"(1) Deliberate and material violation of any provision of the election laws in connection with such nomination, election, approval or rejection.

"(2) Ineligibility of the person elected to the office to hold the office at the time of the election.

"* * * * *."

⑨ ORS 251.045: "Not later than 10 days after the final canvass of votes or other final compilation of the result of any primary, * * * election * * * any person authorized by ORS 251.025 to contest the nomination or election of any person for or to any office * * * may file a petition of contest with the clerk of the circuit court * * *."

one. If petitioner were the only one concerned, we would not allow the use of the writ where he permitted the time to elapse within which he could have brought a statutory contest. However, we believe we should not invoke such a prohibition when the entire voting public has an interest in knowing as soon as possible whether Mrs. Corbett is qualified.

■ In addition, ORS 246.910[10] provides that any person adversely affected by the Secretary of State's failure to act under any election law may appeal therefrom to the circuit court. It would appear that the procedure under this statute is still available to petitioner.

Also, ORS 260.345[11] states that any elector may file a written complaint with the Secretary of State, alleging that a violation of the election laws has occurred. If the Secretary of State, after investigation, believes that the complaint is well founded, he has the duty to prosecute the violation in the name of the state. Petitioner has filed no such written complaint.

---

[10] ORS 246.910: "(1) Any person adversely affected by any * * * failure to act by the Secretary of State * * * may appeal therefrom to the circuit court for the county in which the * * * failure to act occurred * * *."

[11] ORS 260.345: "(1) Any registered elector may file with the Secretary of State, * * * a written complaint alleging that a violation of any provision of the election laws has occurred * * *.

"* * * * *.

"(3) Upon receipt of a complaint or notice under subsection (1) * * * of this section, or upon information otherwise available to him, the Secretary of State immediately shall cause such complaint, notice or other information to be examined for the purpose of determining whether a violation of any provision of the election laws has occurred * * *.

"(4) If the Secretary of State determines under subsection (3) of this section that a violation of any provision of the election laws has occurred, he immediately shall cause such violation to be prosecuted in the name of the state * * *.

"* * * * *."

There is some question whether this procedure can properly be used in determining whether a nominee is qualified to hold office. It may be that its use is limited to allegations of improper conduct in the election in which the candidate is presently engaged. No one is contending that Mrs. Corbett has been guilty of improper practices in securing her nomination for the office of State Treasurer. The question is whether she is disqualified as a candidate for State Treasurer because of her conduct in the election for the State Senate in 1968.

Despite the fact that the procedure under ORS 246.910, and perhaps that under ORS 260.345, is still available to petitioner, we conclude that we should decide the merits of the case. At this late date, it is extremely doubtful whether the procedure under either of the above statutes would constitute an adequate remedy. Both procedures would have to be instituted in circuit court. Undoubtedly, an appeal from the decision of the circuit court would be taken. In the event Mrs. Corbett was found to be disqualified, there would be inadequate time for any substitute nominee to campaign effectively for office. In *Bradley v. Myers*, 255 Or 296, 466 P2d 931 (1970), where the Secretary of State refused to accept a party's filing for office, we permitted the use of a writ of mandamus to determine whether that party was qualified to be a candidate. It seems clear that ORS 246.910 would have been available to the candidate. However, without discussing ORS 246.910, we allowed the use of mandamus to decide the question. The application for the writ was made about two and one-half months prior to the election.[20]

---

[20] In Pense v. McCall, 243 Or 383, 413 P2d 722 (1966), we permitted the use of mandamus to prohibit the Multnomah County

■ Mrs. Corbett also contends that quo warranto is the proper remedy to decide whether she can hold the office of State Treasurer as the result of the 1972 elections. It is not now a proper remedy because the present right to hold the office of State Treasurer is not in issue. Neither the petitioner nor Mrs. Corbett is now State Treasurer. *See State ex rel v. Danielson et al*, 215 Or 5, 328 P2d 868 (1958). If, as suggested by Mrs. Corbett, this matter is dismissed and a quo warranto proceeding is instituted if she is elected and takes office, the electorate would be deprived of a choice for State Treasurer if, in fact, she is disqualified.

■ Petitioner seeks to disqualify Mrs. Corbett under the provisions of ORS 260.365:

"(1) A person nominated or elected to public office, and whose nomination or election has been annulled and set aside for violation of any provision of the election laws, *shall not, during the period fixed by law as the term of such office, serve in any office* or vacancy in any office or position of trust, honor or emolument, whether elected or appointed thereto, *under the laws of the state* or any municipality.

"(2) *Any* appointment or *election* to any office or position of trust, honor or emolument *made in violation of subsection (1)* of this section *shall be void*." (emphasis added.)

The statute provides that a person whose nomination has been set aside for violation of the election laws shall not thereafter serve in any office during the term of the office for which the candidate was dis-

Registrar of Elections from putting on the ballot the name of a candidate who was disqualified from filing. *See* Roberts v. Myers, 260 Or 228, 489 P2d 1148 (1971).

qualified. The State Treasurer takes office on the first Monday of the year;[⑧] a state senator takes office on the second Monday of the year.[⑨] If Mrs. Corbett had been elected State Senator in 1968, her term of office would have expired January 8, 1973. If she is elected State Treasurer, her term of office would begin January 1, 1973, or one week before her period of disqualification expires.

Because the statute prevents only her serving during the period of disqualification and does not prevent her being elected during that time, it is urged that she may avoid the restriction by waiting one week and taking her oath of office after her period of disqualification has expired. It is an appealing argument. However, subsection (2) of the statute states that an *election* to any office *in violation of subsection (1) is void*. This means that an election to an office in which service is required during the period of disqualification is void. The statute was amended in 1971[⑩] and the words "serve in" were substituted for "be elected or appointed to fill." The purpose of this change was to allow disqualified persons *to run* for office during the period of their disqualification. The statute still does not allow persons *to serve* during the period of their disability and the only reasonable construction of subsection (2) is that if such service is required the election is void.

It is apparent from the legislative history that one of the purposes of the 1971 amendment was to allow Mrs. Corbett to run for office in 1972. However,

⑧ Oregon Constitution, Art II, § 14.

⑨ Oregon Constitution, Art IV, § 4.

⑩ Oregon Laws 1971, ch 749, § 34; section renumbered from ORS 260.470 to 260.365.

there is nothing to indicate that it was the intention of the legislature to allow her to run in 1972 for an office for which she could not qualify at the beginning of its term, if she was elected.[16]

Normally, the incumbent continues to hold office until his successor is elected and qualified.[17] However, if Mrs. Corbett were permitted to qualify a week after the State Treasurer's duties began, the present State Treasurer could not hold over until then because he is prevented by the Constitution from serving more than two consecutive elective terms,[18] and he will have completed serving his second such term on the first Monday in January. Therefore, the Governor would be required to appoint someone to serve during the interim.[19] We do not believe the legislature contemplated such an avoidance of the provisions of the statute. If such procedure may be indulged in to avoid the last week of disqualification, the same procedure

[16] In addition to that portion of Senator Mahoney's statement before the committee which is included in the dissenting opinion, the following also appears:

"Question: [by a member of the committee] I understand that what this bill will do its difference is the taking out the word elected and putting in the word served because this Senator Corbett would have wanted to run for the Senate in—

"Mahoney: I don't know what her plans were. * * *

"Question: I am specifically interested in the language on line six which discusses the annulment on setting aside of nomination does this contemplate the setting aside of office and I am interested in your comment that you do not feel that the court should decide the issue does this contemplate the setting aside of office by the Legislative Assembly?

"Answer: No, it contemplates merely that the innovation or prohibition extends only to serving during that period not to be denied against filing * * *."

[17] Oregon Constitution, Art XV, § 1.

[18] Oregon Constitution, Art VI, § 1.

[19] Oregon Constitution, Art V, § 16.

may then be used to avoid the last month, the last year, or the last two years of disqualification.[20]

Furthermore, our conclusion is in keeping with the Oregon Constitution which gives the people the right to elect their State Treasurer. The statute in question should not be construed in a manner which would permit an unnecessary lapse in this right of choice. Placing a party's name on the ballot is a form of representation to the voters that, insofar as can then be known, the candidate, if elected, will be able to qualify for the *full* term of the office. This is the import of that portion of a candidate's declaration of candidacy wherein he states that he will qualify if elected. The following language from the opinion in *Commonwealth v. Keiser*, 340 Pa 59, 16 A2d 307, 312 (1940), is appropriate:

"To permit an ineligible candidate-elect to delay entering upon the duties of his office after his term begins, until the disability is removed by time or at his own caprice, would work a species of fraud upon the electorate, and pro tanto create an interregnum in office incompatible with that continuity in government which is essential to its proper and efficient functioning. This respondent was elected for a term of six years beginning January 1, 1940. When he submitted himself to the people for election, he deceptively declared in his nomination papers that he was qualified to hold the office he sought, and it may be assumed that those who voted for him did so in the mistaken belief that the candidate of their choice would be legally capable of holding the entire term for which they were balloting. That they were deceived with respect to a matter of days, rather than of months or years,

---

[20] Cases concerning this and similar problems are collected in 88 ALR 812, 831 (1934), and 143 ALR 1026, 1031 (1943).

is a difference in the extent of the deception, not in its nature. Its effect in either event was to bring about the election of one who could not, by any act of his own, or in any possible circumstances, remove the disqualification so as to completely fill the office for which he was standing, and to which he had been elected by a misinformed constituency.

"From the standpoint of the public interest in the continuity of office, it is equally important that an elected officer shall be eligible to hold the office from the beginning of its term. Circumstances such as illness, unavoidable absence at the beginning of the term and the like, may excuse his entering upon the duties of the office immediately, so that he may not be removable for failing to do so. But he cannot require that an office, the public need for which is sufficiently evidenced by its creation and existence, shall remain vacant for any length of time while he is qualifying himself to assume it ✻ ✻ ✻ ."@

There would be no interregnum in the office in the present situation since Oregon law provides that the Governor will fill the vacant office by appointment. However, the appointee, even though appointed for a term of only one week, would not have been elected by the voters. Thus, the voters would have been, in effect, partially disenfranchised.

It is our conclusion that Mrs. Corbett is not qualified to be a candidate for the office of State Treasurer in the November 1972 general election because, if elected, she cannot qualify at the beginning of her term as the result of the disability imposed upon her by the provisions of ORS 260.365. The demurrer to the alternative writ of mandamus is overruled and a peremptory writ of mandamus will issue

---

@ *See* State v. Mucci, 10 Ohio St 2d 60, 225 NE2d 238, 241 (1967).

to the Secretary of State requiring him to omit Alice Corbett's name from the list of those certified as candidates for the forthcoming general election.

BRYSON, J., dissenting.

The majority opinion concludes that Mrs. Corbett is not qualified as the Democratic candidate for the office of State Treasurer in the 1972 general election because of the provisions of ORS 260.365. I disagree on two basic principles: the constitutional protection to be given the candidate, Corbett, and the electors who supported her; the statutory construction to be given ORS 260.365 as discerned from the legislative intent in amending this statute at the 1971 session of the Oregon Legislature.

In the 1972 primary election, Alice Corbett, Intervenor, received 120,885 votes for Democratic nominee to the office of Treasurer of the State of Oregon. Philip H. McAlmond, Petitioner, received 77,331 votes. Three other candidates for nomination to the office received a lesser number of votes. Clearly, the electors voting in the Democratic primary desired Alice Corbett as their nominee for the office of State Treasurer in the forthcoming general election.

The petitioner contends that Alice Corbett is unqualified and lacks eligibility to hold the office of Treasurer of the State of Oregon on the day she would take office if elected in the November general election. This is so because the Oregon Constitution, Art II, § 14 provides that a person elected as treasurer "shall assume the duties of their * * * [office] on *the first Monday in January following such election.*" (Emphasis supplied.) In *Cook v. Corbett,* 251 Or 263, 273, 446 P2d 179 (1968), this court held that "Mrs. Corbett must be deprived of the Democratic nomination for

Senator, Twelfth Senatorial District, Multnomah County, * * *." She had used the slogan in campaign material and in the Voters' Pamphlet, "Re-elect Senator Corbett." She had served two consecutive terms in the Senate from Multnomah County; her last term expired in January, 1967. At the time of the May, 1968, primary, she was not an incumbent Senator. For discussion and analysis of *Cook v. Corbett, supra; Thornton v. Johnson,* 253 Or 342, 453 P2d 178 (1969), motion to stay mandate denied, 253 Or 364, 454 P2d 647 (1969); *Mosee v. Clark,* 253 Or 83, 453 P2d 176 (1969); and *Combs v. Groener,* 256 Or 336, 472 P2d 281 (1970), involving the Oregon Corrupt Practices Act, Oregon Revised Statutes ch 260, *see* Charles A. Rees, "Uncandid Candidates and the Oregon Corrupt Practices Act," 50 Or L Rev 299 (1971).

ORS 260.365 provides:

"(1) A person nominated or elected to public office, and whose nomination or election has been annulled and set aside for violation of any provision of the election laws, shall not, during the period fixed by law as the term of such office, serve in any office or vacancy in any office or position of trust, honor or emolument, whether elected or appointed thereto, under the laws of the state or any municipality.

"(2) Any appointment or election to any office or position of trust, honor or emolument made in violation of subsection (1) of this section shall be void."

Article IV, § 4, of the Oregon Constitution provides:

"(1) The Senators shall be elected for the term of four years, * * *. The term of each Senator * * * *shall commence on the second Monday in January following his election* * * *. [Emphasis supplied.]

"* * * * *."

For a period ending in November, 1960, Article IV, § 4, of the Oregon Constitution provided that the term of each Senator would commence on the first Monday in January following election, the same as the office of Treasurer of the State of Oregon.

Thus, there is a hiatus of one week (including a Saturday and a Sunday) in which Mrs. Corbett could not "serve," (ORS 260.365), as State Treasurer, if elected in the general election of November, 1972, because the term of the office of State Senator from which she was removed as Democratic nominee expires on the second Monday in January, 1973, and the term of office of Treasurer, which she now seeks, begins on the first Monday in January, 1973. It should be noted that the opinion in *Cook* merely deprived Mrs. Corbett of the Democratic nomination for Senator and did not place any restriction on her further election to a state office. The restriction follows by application of the then statutory provision, ORS 260.470, now ORS 260.365.

The 1971 Oregon Legislature passed a bill (a committee bill culminating from Senate Bill 20 and Senate Bill 225) with the intent of allowing Mrs. Corbett to run for public office in 1972 so that she could hold such office in 1973 if elected by the voters. This was accomplished by adopting Oregon Laws 1971, ch 749, amending ORS 260.470, now ORS 260.365. Senate Bill 225, introduced by Senator Mahoney and passed by the Senate, read as follows:

"A BILL FOR AN ACT

"Relating to corrupt practices; amending ORS 260.470.

**"Be it Enacted by the People of the State of Oregon:**

"Section 1. ORS 260.470 is amended to read:

"260.470 (1) A candidate nominated or elected

to an office, and whose nomination or election has been annulled and set aside for violation of any provision of the election laws, shall not, during the period fixed by law as the term of such office, [*be elected or appointed to fill*] serve in any office or vacancy in any office or position of trust, honor or emolument, whether elected or appointed thereto, under the laws of the state or any municipality.

"(2) Any appointment or election to any office or position of trust, honor or emolument made in violation of subsection (1) of this section shall be void."

The editor's statement of the essential features of the measure as introduced read as follows:

"Revises to clarify provision that bars candidate, whose nomination or election to office is set aside for election law violation, from public service during term of such office."

After passing the Senate, Senate Bill 225 was referred to the Committee on Elections and Reapportionment and the language of Senate Bill 225 became Section 34 of Senate Bill 20 and was subsequently passed by both houses of the legislature and became Oregon Laws 1971, ch 749. It was conceded at the time of argument that the gist of this legislation was to allow Mrs. Corbett to run for office. In other words, it removed the prohibition which prevented her from being elected or appointed to office for a period of four years by reason of the decision in *Cook*.

In construction of ORS 260.365, the legislature's intention in amending and adopting the statute at the 1971 legislative session is of primary importance in determining the issue before the court. In *Berry Transport, Inc. v. Heltzel,* 202 Or 161, 165, 272 P2d 965 (1954), we held:

"In the construction of statutes, when construc-

tion is necessary or proper, the primary and governing rule to be followed and the one that is law and binding upon the court is to ascertain and declare the legislative intent. All other rules of statutory construction are secondary in importance and are simply guides to aid in the application of the primary rule * * *."

ORS 174.020 provides:

"In the construction of a statute the intention of the legislature is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

ORS 174.030 provides:

"Where a statute is equally susceptible of two interpretations, one in favor of natural right and the other against it, the former is to prevail."

It is the natural right of electors of major political parties to seek office and vote for the candidate of their choice. This being an original petition for mandamus in this court, there is no record to review. Counsel, at the time of argument, referred to the records of the hearings before the legislature and invited the court to examine the same. In this day of electronic recording and reproduction of words, the committee hearing "record" is preserved on electronic tape and filed with the State Archivist.

"* * * [I]f the words of the statute are not of themselves sufficiently explicit to manifest the intention of the lawmakers, the intention is then to be ascertained by considering the context, the subject matter, the necessity for the law, and the circumstances under which it was enacted, the mischief sought to be remedied, and the object to be attained * * *." *Union Fishermen's Co. v. Shoemaker*, 98 Or 659, 671, 193 P 476 (1921).

*See also Curly's Dairy v. Dept. of Agriculture*, 244 Or 15, 21, 415 P2d 740 (1966).

Certainly, ORS 260.365, as amended, is ambiguous and subject to different interpretations. What was intended by the legislature in deleting from the statute the words "be elected or appointed to fill" and inserting in lieu thereof "serve in"? See wording of Senate Bill 225, *supra*. To "serve," when qualified, after election, is surely something different than being "elected."

The history of Senate Bill 225, which became Section 34 of Enrolled Senate Bill 20, is as follows. The bill passed the Senate and went to the House of Representatives. After the second reading, it was referred to the Committee on Elections and Reapportionment. Thereafter, Senator Mahoney appeared before the House committee and stated as follows:

"* * * [I]ts [Section 34 of the bill] purpose actually is to clarify provision of the Corrupt Practices Act. It has specific reference to an incident that happened, when in 1968 former Senator Alice Corbett's nomination to the democratic nomination was challenged by her incumbent opponent on the grounds that she violated the Corrupt Practices Act in using the word re-election. * * * Here is the intent for the title for that law. * * * This portion of the Statute I have reference to states if a person even technically violates the corrupt practice act they can be fined; they can be declared invalid in a nomination and election and in addition thereto they may not occupy a public office or even be a candidate for a public office during the particular term of the person who is successor. Alice Corbett in this case lost a nomination and lost the opportunity for the office and not only that, was barred from holding offices during this term but under one construction, one possible construction

of the law might even be prevented from running for any public office during that term. * * * [H]ere is a case that seems to me that the penalty was unusually harsh, more certainly than has been intended so I'm not making any particular pitch for the law, I did author the bill * * * I sought to rectify an injustice * * * I am advised they conformed Senate Bill 20 and among other things they conformed it to Senate Bill 225 so you will know when it comes out * * *."

Thus, the legislature intended to amend ORS 260.470, now ORS 260.365, and the amendment was for the specific purpose of relieving Mrs. Corbett from the prohibition of her being a candidate for public office in the 1972 primary and general elections. There was no other express reason for the legislature to adopt Section 34 of the 1971 amendment. The statute, Oregon Laws 1971, ch 749, § 34, now states that she may not "serve" in any office (State Treasurer) until the second Monday in January, 1973. It no longer says she may not be "elected or appointed" to such an office. Obviously, the legislature overlooked the possibility of some elected officers taking office on the first Monday in January. A legislator having suffered the penalties under *Cook v Corbett, supra,* can now be nominated and, if elected, could be qualified and allowed to "serve" in such office. People casting their ballot for such a candidate would not again be disenfranchised in the primary election. To draw a distinction between a candidate for State Treasurer and a candidate for the State Senate is rather absurd and also unconstitutional, as hereinafter discussed.

" 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always therefore

be presumed that the Legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' *United States v. Kirby*, 74 U. S. 482, 7 Wall. 482, 19 L. ed. 278, 280; *Church of The Holy Trinity v. United States*, 143 U. S. 457, 12 S. Ct. 511, 36 L. ed. 226. See to the same effect, *Schwab v. Moving Picture Operators*, 165 Or. 602, 619, 109 P. (2d) 600; *State v. Gates*, 104 Or. 112, 123, 206 P. 863." *Fish v. Bishop*, 176 Or 210, 213, 156 P2d 204 (1945); also cited with approval in *Peters et al v. McKay et al*, 195 Or 412, 441, 238 P2d 225 (1952).①

Assuming that the intervenor cannot be qualified to hold office from the first Monday in January, 1973, until the second Monday in January, 1973, there is no reason why the present State Treasurer could not continue in office for that one-week period until the intervenor is qualified and allowed to serve. While Art VI, § 1, of the Oregon Constitution provides that the treasurer of the state shall not be eligible to hold office "more than Eight in any period of Twelve years," nevertheless, Art II, § 12, of the Oregon Constitution provides:

> "In all cases, in which it is provided that an office shall not be filled by the same person, more than a certain number of years continuously, an appointment pro tempore shall not be reckoned a part of that term."

Also, Art V, § 16, of the Oregon Constitution provides:

> "* * * [W]hen at any time a vacancy shall

---

① "* * * Where the intent is plain, nothing is left to construction. Where the mind labors to discover the design of the legislature, it [the court] seizes everything from which aid can be derived * * *." Church of the Holy Trinity v. United States, 143 US 457, 462, 12 S Ct 511, 36 L Ed 226 (1891).

have occurred in any * * * state office, * * * the governor shall fill such vacancy by appointment, which shall expire when a successor shall have been elected and qualified; * * *."

Article II, § 16, of the Oregon Constitution provides:

"In all elections authorized by this constitution until otherwise provided by law, the person or persons receiving the highest number of votes shall be declared elected. * * * Every qualified elector resident in his precinct and registered as may be required by law, may vote for one person under the title for each office. * * * For an office which is filled by the election of one person it may be required by law that the person elected shall be the final choice of a majority of the electors voting for candidates for that office. These principles may be applied by law to nominations by political parties and organizations."

ORS 249.450 provides:

"In all primary elections in this state, under the provisions of the primary election law, the candidate receiving the highest number of votes for nomination or election to any office shall be deemed to have been nominated or elected by his major political party for that office."

It was the intent of the 1971 legislature, in adopting Oregon Laws 1971, ch 749, § 34, to revise the provision that bars a candidate, whose nomination or election to office is set aside for election law violation, and to specifically allow Mrs. Corbett to be a candidate for public office in the 1972 elections and if elected to "serve" in that office.

The state has a legitimate interest in safeguarding its election process from corrupt and irresponsible campaign practices. *Jenness v. Fortson,* 403 US 431,

91 S Ct 1970, 29 L Ed 2d 554 (1971). It is not here contended that Alice Corbett has indulged in such a practice during the 1972 primary election. Although the state has considerable power to set candidate qualifications and to punish violators, this power may not be exercised in a manner inconsistent with the equal protection clause of the Fourteenth Amendment of the Constitution of the United States. This includes state primary elections. In the recent case of *Bullock v. Carter*, 405 US 134, 92 S Ct 849, 31 L Ed 2d 92 (1972), the United States Supreme Court struck down Texas statutes providing for certain filing fees by candidates in the primary election, stating, at 854-57:

"* * * Although we have emphasized on numerous occasions the breadth of power enjoyed by the States in determining voter qualifications and the manner of elections, this power must be exercised in a manner consistent with the Equal Protection Clause of the Fourteenth Amendment. [Citations omitted.] The question presented in this case is whether a state law which prevents potential candidates for public office from seeking the nomination of their party due to their inability to pay a portion of the cost of conducting the primary election is state action that unlawfully discriminates against the candidates so excluded or the voters who wish to support them.

"* * * * *

"* * * [W]e must determine whether the strict standard of review of the *Harper* case [Harper v. Virginia Board of Elections, 383 US 663, 86 S Ct 1079, 16 L Ed 2d 169 (1966)] should be applied.

"The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters

and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. * * * [T]he Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from whom voters might choose. * * * In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

"* * * * *.

"* * * However, even under conventional standards of review, a State cannot achieve its objectives by totally arbitrary means; the criterion for differing treatment must bear some relevance to the object of the legislation. [Citations omitted]."

*See also Williams v. Rhodes,* 393 US 23, 89 S Ct 5, 21 L Ed 2d 24 (1968).

ORS 260.365, the statute under which petitioner seeks to disqualify Mrs. Corbett, does not meet this constitutional requirement. The statute unfairly burdens a class of candidates to which Mrs. Corbett belongs and thereby denies her protection of the law as well as the electorate that voted for her. A statute such as ORS 260.365, although apparently fair and equal on its face, is not insulated from the Fourteenth Amendment if, in its actual application, persons or classes similarly situated received demonstrably unfair treatment. The Oregon Constitution, as stated, provides that all state officers, such as State Treasurer, shall assume the duties of their office "on the first Monday in January following such election." It also provides, as stated *supra,* that the office of State Senator "shall commence on the second Monday in January following his election * * *." Thus, a can-

didate for executive office who is penalized for corrupt practices is disqualified from serving in any office until the first Monday in January, four years hence. In the primary and general elections following the four-year disqualification, such a state candidate would be able to campaign not only for another state office but for any seat in the legislature because the period of disqualification will terminate one week before the date set by the Oregon Constitution for commencement of a legislative office. Contrarily, a candidate for a legislative seat (State Senator) who is penalized for corrupt practices is disqualified from serving in any office until the second Monday in January, four years hence. ORS 260.365 will not prevent him from again seeking the seat for which he was disqualified because the disqualification and the commencement of office bear the same date. However, such a legislative candidate would be barred as a candidate in the primary and general elections for state office (Treasurer) under the holding in the majority opinion. In fact, such a legislative candidate would also be disqualified to serve in an executive office for an additional two-year period. It is uncomprehensible that the legislature would attempt to penalize candidates for the legislature for a longer period than candidates for any state office.

The result is wholly unrelated to the severity of the violation of the Corrupt Practices Act by Mrs. Corbett in 1968. No number of write-in votes by Mrs. Corbett's supporters can circumvent the additional burden of ORS 260.365, as interpreted by the majority opinion.

When considering legislation which burdens the right of an individual to be considered for public office,

or the right of political parties to qualify their candidates for the ballot, or the right of the individual voters to participate effectively in the electoral process, the United States Supreme Court has taken an increasingly active role in whether such legislation unreasonably encumbers the exercise of these fundamental rights. *See Bullock v. Carter, supra*; *Kramer v. Union Free School District*, 395 US 621, 89 S Ct 1886, 23 L Ed 2d 583 (1969); *Williams v. Rhodes, supra. See also, Turner v. Fouche*, 396 US 346, 90 S Ct 532, 24 L Ed 2d 567 (1970), where the United States Supreme Court found that Georgia's freeholder requirement for school board membership had no rational relationship to the achievement of a valid state objective. These cases demonstrate that the focus of appellate review should be on the relative importance of the right asserted to the individual or the class discriminated against and the justification asserted by the state in support of such legislation.

"* * * Lower federal courts, interpreting *Williams,* have concluded that the right to run for office in local elections is fundamental and should be subject to strict scrutiny * * *." Page 1545.

"* * * A compelling state interest should be demonstrated before courts allow states to assert restrictions on ballot access. Our democratic system required a strict review to make the franchise available to all people, whether categorically denied, or diluted through apportionment; that same standard should be applied to candidate restrictions which deny the voter an effective choice." Wassenaar, "The Emerging Right to Candidacy in State and Local Elections: Constitutional Protection of the Voter, The Candidate, and the Political Group." 17 Wayne L Rev 1543, 1559 (1971).

Statutes regulating candidacy for public office,

whether it be pre-primary, primary or general elections, involve two rights: (1) that of the candidate seeking public office; and (2) that of the electorate seeking to show their will via the free ballot. The right of the electorate to select their representatives through an effective exercise of the franchise has always been considered fundamental. *Kramer v. Union Free School District, supra.*

"* * * [S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims,* 377 US 533, 562, 84 S Ct 1362, 1381, 12 L Ed 2d 506, 527 (1964).

*Bullock v. Carter, supra,* clearly indicates the statutes which unfairly burden candidates and the electorates supporting them will not be upheld unless they are *necessary* to the accomplishment of a legitimate state interest, even though they do not entirely lack a rational basis.

The Corrupt Practices Act, ORS ch 260, was adopted to "prevent and punish corrupt and illegal practices in nominations and elections * * *." *See* Preamble, Oregon Laws 1909, ch 3. This is a legitimate state objective and undoubtedly the penalty imposed by ORS 260.365 prevents many undesirable campaign practices and rightfully punishes erring candidates. However, it also acts to completely bar a candidate such as Mrs. Corbett from seeking executive office for an unreasonable period of time. Undoubtedly, the legislature had no desire to impose an additional two-year penalty on candidates for the legislature who subsequently desired to run for an executive office. Furthermore, and probably more importantly, the voters are

absolutely prevented from electing Mrs. Corbett to the office of State Treasurer for an additional two-year period. Their choice, as expressed by the ballot in the 1972 primary, to elect her in 1972 to serve in the office beginning in 1973 is rendered impossible, not merely more difficult, as construed by the majority opinion. No one in this case charges Mrs. Corbett with any violation of the Corrupt Practices Act. The petition for mandamus is based on a poorly constructed statute which would result in an absurd consequence. If we accept the construction of the statute as argued by the petitioner, the result would deny the equal protection of the law to the candidate, Alice Corbett, and to the 120,885 Democratic electors who voted for her in the 1972 primary election. The statute, ORS 260.365, and its history, reveals no criteria for differing treatment between candidates for State Senator and other state offices, and bears no relevance to the expressed object of the legislation. Further, the law does not notice or care for trifling matters (the one-week hiatus), *de minimis non curat lex*. Since the state has not met the burden of justification for applying a more stringent penalty in Mrs. Corbett's situation, I would deny the original petition for mandamus and allow her name to be placed on the 1972 general ballot as the Democratic nominee for State Treasurer.